Lydia Rodríguez Pagán, demandante y recurrida, *v.* Departamento de Servicios Sociales y el Estado Libre Asociado de Puerto Rico, demandados y recurrentes.

*Número:* RE-89-441 *Resuelto:* 3 de febrero de 1993

618

620

*Jorge E. Pérez Díaz, Procurador General, Norma Cotti Cruz, Subprocuradora General, y María Adaljisa Dávila, Procuradora General Auxiliar*, abogados del recurrente; *José R. León Hernández*, de *Servicios Legales de Puerto Rico, Inc.*, abogado de la recurrida.

EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ emitió la opinión del Tribunal.

A solicitud del Departamento de Servicios Sociales revisamos la sentencia dictada por el Tribunal Superior de Puerto Rico, Sala de Ponce, que declaró inconstitucional la *práctica* establecida por dicho Departamento de denegarle a los menores colocados por la referida agencia en hogares de crianza, *pertenecientes a familiares de los mismos*, el pago de subvención brindado a los menores colocados en hogares de crianza pertenecientes a personas *extrañas* a éstos.

I

El 8 de diciembre de 1982, el Departamento de Servicios Sociales ubicó en el hogar de Lydia Rodríguez Pagán, aquí recurrida, a los menores Beny Rosario y Lumarie y Migdalia Rodríguez Cornier. A base de los informes rendidos por el referido Departamento, el 17 de enero de 1983, el Tribunal de Distrito, Sala de Juana Díaz, le concedió la custodia provisional de los tres (3) menores a Lydia Rodríguez Pagán hasta tanto la madre de los niños recibiera tratamiento y estuviera en condiciones de asumir nuevamente la custodia de sus hijos. La señora Rodríguez Pagán es "tía paterna" de las menores Lumarie y Migdalia Rodríguez, pero no tiene relación de consanguinidad alguna con el menor Beny Rosario. A pesar de los *limitados* recursos económicos de la recurrida Rodríguez Pagán, ésta aceptó a los menores con la razonable expectativa de recibir la subvención mensual de cien dólares ($100) *por cada menor* que

dispone el Reglamento del Departamento de Servicios Sociales para los hogares de crianza.[1]

La Sra. Lydia Rodríguez Pagán solicitó de Servicios Sociales el pago de la subvención relativa a sus dos (2) sobrinos; el mismo le fue denegado. El Departamento fundamentó su denegatoria en que *la práctica* establecida por ellos consiste en pagar la subvención *únicamente* a los menores colocados en un hogar de crianza perteneciente a personas que *no* son familiares del menor.

Ante tal situación, el 23 de mayo de 1985, la Sra. Lydia Rodríguez Pagán presentó demanda sobre Sentencia Declaratoria y Cobro de Dinero, ante el Tribunal Superior de Puerto Rico, Sala de Ponce, en la que solicitó que se decretara la inconstitucionalidad de la antes mencionada práctica establecida por el Departamento de Servicios Sociales por, alegadamente, violar la misma la cláusula de igual protección de las leyes. En adición, solicitó del referido foro judicial que ordenara el pago retroactivo de la mencionada subvención a la fecha de ubicación de los menores en su hogar. Dicha demanda fue enmendada, el 5 de noviembre de 1985, para incluir a los menores como demandantes con el propósito de reclamar daños y perjuicios, valorados en veinte mil dólares ($20,000) por la privación de sus necesidades básicas en la vida cotidiana. Finalmente, se alegó que el Departamento demandado adeudaba a la parte demandante, a la fecha de la radicación de la demanda, la suma de nueve mil ciento sesenta y cinco dólares ($9,165) por concepto del cuido de los menores.

Celebrada la vista en su fondo, y luego que ambas partes presentaran memorandos de derecho, el tribunal de instancia dictó sentencia en la que declaró inconstitucional la práctica establecida por el Departamento de Servicios

---

[1] Manual de Normas y Procedimientos para los Servicios del Programa de Servicios a Familias con Niños, Servicios de Hogares Sustitutos, Revisión de 16 de marzo de 1984, Cap. VI.

Sociales de negarle los beneficios económicos a menores colocados en hogares pertenecientes a familiares. Determinó dicho foro que la misma violaba la cláusula sobre igual protección de las leyes. El tribunal a quo, en adición, ordenó al Departamento de Servicios Sociales efectuar el pago retroactivo correspondiente, a la fecha de ubicación de los niños en el hogar de la demandante, a razón de cien dólares ($100) mensuales por cada uno de los menores.

Inconforme, el Departamento recurrió ante este Tribunal. En el recurso de revisión que a esos efectos radicó le imputó al tribunal de instancia haber errado al

> ... declarar inconstitucional la práctica del Departamento de Servicios Sociales estableciendo que los menores colocados en hogares de crianza pertenecientes a sus familiares (los cuales no están obligados legalmente a proveerles alimentos) no tienen derecho a la subvención mensual de $100.00 aun cuando se demuestre la necesidad de la subvención.

Expedimos el auto de revisión solicitado. Estando en condiciones de resolver el recurso, procedemos a así hacerlo.

## II

Nos enfrentamos a una situación en que se alega que, no obstante el estatuto en controversia ser uno neutral y constitucional de su faz, la aplicación o implantación del mismo —alegadamente en forma arbitraria, selectiva y discriminatoria respecto a una persona o grupo de personas— por la agencia administrativa encargada de su implantación redunda en, o constituye, una violación al derecho a la igual protección de las leyes.

El planteamiento, dados los hechos específicos del caso, ciertamente no es uno frívolo. Como es sabido, una "ley, o parte de la misma, que de su faz resista el escrutinio judicial de su validez, podrá guardar vicio de inconstitucio-

nalidad si sus efectos, en la interacción con otra legislación en el amplio campo del ordenamiento legal, operan en detrimento y vulneración de *derechos fundamentales* de la persona". (Énfasis suplido.) *Torres v. Castillo Alicea*, 111 D.P.R. 792, 800 (1981).[2]

La correcta solución del planteamiento ante nuestra consideración requiere, en consecuencia, que consideremos y analicemos: la responsabilidad del Estado Libre Asociado, asumida bajo su poder de *parens patriae*, respecto a los menores de edad al amparo de las disposiciones de la Ley Núm. 75 de 28 de mayo de 1980[3] y bajo las disposiciones de la Ley Núm. 3 de 15 de febrero de 1955;[4] las raíces constitucionales, y consecuencias jurídicas, del derecho de un menor a ser alimentado en su interacción con el derecho a la vida reconocido por nuestra Carta de Derechos, y la validez de la acción del Estado al establecer la clasificación aquí impugnada a la luz del criterio o escrutinio constitucional correcto aplicable a esta situación en específico.

### III

El Estado Libre Asociado, en el ejercicio de su poder de *parens patriae*, reconoce su responsabilidad de velar por aquellos niños que son víctimas de maltrato, abuso y negligencia; la de proveerles a éstos los servicios necesarios para fortalecer la familia de donde ellos provie-

---

[2] Reiteradamente hemos señalado que la interpretación administrativa de una ley por el funcionario encargado de ponerla en vigor y velar porque sus fines se cumplan merece gran peso y deferencia, *A.R.P.E. v. Ozores Pérez*, 116 D.P.R. 816 (1986); *Tormos & D.A.C.O. v. F.R. Technology*, 116 D.P.R. 153 (1985); *Asoc. Médica de P.R. v. Cruz Azul*, 118 D.P.R. 669 (1987), siempre y cuando la interpretación y la implantación del estatuto o reglamento no afecte sustancialmente derechos fundamentales.

[3] Ley de Protección a Menores, 8 L.P.R.A. sec. 401 *et seq.*

[4] Ley para la Licencia y Supervisión de Instituciones Privadas para Niños, 8 L.P.R.A. sec. 68 *et seq.*

nen, y, de ello no ser posible, ofrecerles a dichos menores un cuidado fuera del hogar en un ambiente saludable.[5] Para cumplir con esa responsabilidad, el Departamento de Servicios Sociales, a través del "Programa de Servicios a Familias con Niños de la Secretaría de Servicios a la Familia", ofrece *servicios de protección* a menores y a sus familias. Los servicios de protección están encaminados a asegurar el bienestar del menor en situaciones donde, por acciones u omisiones de los padres o encargados, un menor es víctima o está en riesgo de ser víctima de maltrato físico o emocional.[6] Con el fin de lograr el bienestar del menor, el Departamento presta los siguientes servicios de protección dentro y fuera del hogar: orientación familiar, ama de llaves, cuidado diurno, colocación en un hogar de crianza o en otro establecimiento de cuidado, y la adopción.[7]

■ El Manual de Normas y Procedimientos para los Servicios del Programa de Servicios a Familias con Niños establece que el hogar de crianza es aquel que sustituye al hogar propio, donde el niño es tratado como hijo de familia y donde se le brinda "experiencias de la vida en familia que se consideran indispensables para alcanzar un buen equilibrio de la personalidad o para aminorar el impacto de problemas que pueden ser destructivos para el propio niño o para la sociedad".[8] En el hogar de crianza se le ofrece al niño albergue, comida, ropa, recreación, atención médica, oportunidad de asistir a la escuela y a la iglesia, y el cariño de un núcleo familiar. A esos efectos, véase *Hidalgo v. Depto. Servicios Sociales*, 129 D.P.R. 605 (1991); véase, en

---

[5] Véase Exposición de Motivos de la Ley Núm. 75 de 28 de mayo de 1980 (8 L.P.R.A. sec. 401 *et seq.*).

[6] Ley de Protección a Menores, *supra*, 8 L.P.R.A. sec. 403.

[7] Véase Manual de Normas y Procedimientos para los Servicios del Programa de Servicios a Familias con Niños, ante, Cap. IV, pág. 5.

[8] Véase Manual de Normas y Procedimientos para los Servicios del Programa de Servicios a Familias con Niños, ante, Cap. VI, pág. 3.

adición, *Smith v. Organization of Foster Families*, 431 U.S. 816, 823 (1977).

■ A tenor con la Ley Núm. 3, ante, según enmendada, 8 L.P.R.A. sec. 68 *et seq.*, se le exige a todo hogar de crianza obtener una licencia expedida por el Departamento de Servicios Sociales para poder desempeñar esta función social. Los hogares de crianza, naturalmente, son supervisados por el Departamento de Servicios Sociales. Un trabajador social visita y orienta a los padres de crianza para mantener un buen nivel de servicios con relación. a los niños colocados; para verificar que los hogares mantengan los requisitos necesarios para el cuido del niño; para que la familia de crianza se sienta satisfecha; y para trabajar en el desarrollo del plan de permanencia del niño. El trabajador social supervisa, además, las relaciones entre los padres del niño, los padres de crianza y los niños. Todo lo relacionado con visitas a los niños, la salud y la educación de los niños debe ser discutido y planeado entre el trabajador social, los padres y los padres de crianza.[9]

■ El hogar de crianza puede ser subvencionado o puede ser gratuito.[10] En cuanto a los subvencionados, el Departamento paga una subvención mínima de cien dólares ($100) mensuales. Esta subvención proviene en su totalidad *de fondos estatales* los cuales son asignados al Departamento.[11] Dicha subvención es para cubrir los gas-

---

[9] Véase Manual de Normas y Procedimientos para los Servicios del Programa de Servicios a Familias con Niños, ante, Cap. VI, págs. 67, 87, 96 y ss.

[10] Véase Manual de Normas y Procedimientos para los Servicios del Programa de Servicios a Familias con Niños, ante, Cap. VI, págs. 5 y 6.

[11] El programa federal conocido como A.F.D.C.–F.C. (*Aid to Family with Dependent Children—Foster Care*), regulado por la Sec. 408(a)(1)(2) del *Social Security Act* de 1935 (42 U.S.C. sec. 608(a)(1)(2)) provee una subvención a los menores colocados en hogares de crianza (*Foster Care Homes*). Esta ley fue interpretada en *Miller v. Youakim*, 440 U.S. 125 (1979); el Tribunal Supremo de Estados Unidos interpretó que el programa (A.F.D.C.–F.C.) provee una subvención a los *hogares de crianza que cualifiquen* sin importar que dicho hogar estuviese compuesto por familiares del menor. En *Lipscomb by and through DeFehr v. Simmons*, 962 F.2d 1374 (9no Cir.

tos de alimentación, ropa, artículos de uso personal, gastos mensuales, juguetes, juegos, recreación, efectos escolares, ropa de cama para el niño, servicios médicos de emergencia, transportación y gastos misceláneos.[12] Si el niño tuviese necesidades especiales que no se cubren con la subvención, el trabajador social puede solicitar que se le autorice a pagar una subvención mayor.[13] Aunque el reglamento establece y define los hogares de crianza subvencionados y los gratuitos, *no establece, sin embargo, cuándo y bajo qué requisitos es que un hogar tiene derecho a ser subvencionado.*

Cuando un menor es removido de la custodia de sus padres por el Departamento de Servicios Sociales, el Estado asume una delicada y significativa función en la sociedad. El Estado, desde ese momento en adelante, es el único encargado de promover el bienestar de ese menor; todas sus acciones deben ir encaminadas a lograr ese fin. *Schall v. Martin*, 467 U.S. 253 (1984). Se observa que la agencia asume y retiene la responsabilidad por el niño cuando está en el hogar de crianza.[14] No debe perderse de

---

1992), el tribunal sostuvo la constitucionalidad de un estatuto similar al nuestro, de un planteamiento sobre el derecho de todo niño de asociarse con sus familiares.

En el caso de autos, el pago de subvención que dispone el Reglamento provienen de fondos completamente estatales, por lo que no es de aplicación las regulaciones provistas por el programa federal para hogares de crianza.

[12] Manual de Normas y Procedimientos para los Servicios del Programa de Servicios a Familias con Niños, ante, Cap. VI, pág. 53.

[13] Manual de Normas y Procedimientos para los Servicios del Programa de Servicios a Familias con Niños, ante, Cap. VI, pág. 85.

[14] El Departamento de Servicios Sociales tiene la misión, y responsabilidad, de:

. . . . . . . .

"(2) Aceptar niños dependientes o abandonados, puestos bajo su custodia por el Tribunal Superior. También podrá aceptar, de padres o parientes, niños que después de la debida investigación se determine necesitan su cuidado. Los niños que así se reciban estarán bajo la dirección de la División y serán colocados en hogares de crianza, incluyendo hogares subvencionados y no subvencionados, y hogares adoptivos, o en uno de los Hogares Estaduales para Niños. *La División retendrá la custodia y la dirección de cada niño que reciba hasta que sea éste devuelto a sus padres o a uno de ellos; a sus parientes; puesto en libertad por no necesitar ayuda por más tiempo;*

vista, por otro lado, que constituye política pública del Estado Libre Asociado, a través de su Departamento de Servicios Sociales, "[l]a provisión de servicios sociales y asistencia económica a personas o familias impedidas de proporcionarse por sí mismas los medios esenciales a una vida decente"; esto es, una responsabilidad básica del Gobierno. Sec. 1 de la Ley Núm. 95 de 12 de mayo de 1943, según enmendada, 8 L.P.R.A. sec. 1.

▆▆▆▆▆▆ De ordinario, el deber de alimentar a un menor recae en primera instancia sobre sus padres y ascendentes.(15) Sin embargo, cuando una persona, en este caso el menor, entra en una relación especial con el Estado, como es la de custodia, el Estado asume una obligación afirmativa de asegurarle al individuo sus derechos constitucionales. *Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326 (3er Cir. 1987); *Escamilla v. City of Sant Ana*, 796 F.2d 266 (9no Cir. 1986). Se ha reconocido que el Estado tiene una responsabilidad constitucional hacia los niños que custodia. *Taylor by and through Walker v. Ledbetter*, 818 F.2d 791 (11mo Cir. 1987).

---

*adoptado o puesto por una Sala de jurisdicción competente bajo otra custodia o dirección.*" (Énfasis suplido.) Sec. 10(d)(2) de la Ley Núm. 95 de 12 de mayo de 1943, según enmendada, 8 L.P.R.A. sec. 10(d)(2).

(15) El Código Civil, en su Art. 143 (31 L.P.R.A. sec. 562), dispone lo siguiente:

"Están obligados recíprocamente a darse alimentos, en toda la extensión que señala la sección precedente:

"1. Los cónyuges.

"2. Los ascendientes y descendientes legítimos.

"3. Los padres y los hijos legitimados y los descendientes legítimos naturales e ilegítimos de éstos.

"5. El adoptante y el adoptado.

"Los hermanos deben también a sus hermanos legítimos, aunque sólo sean uterinos o consanguíneos, los auxilios necesarios para la vida, cuando por un defecto físico o moral o por cualquiera otra causa que no sea imputable al alimentista, no puede éste procurarse su subsistencia. En estos auxilios están, en su caso, comprendidos los gastos indispensables para costear la instrucción elemental y la enseñanza de una profesión, arte u oficio."

## IV

■ Reiteradamente hemos resuelto que los casos relacionados con alimentos de menores están revestidos del más alto interés público. *López v. Rodríguez*, 121 D.P.R. 23 (1988); *Negrón Rivera y Bonilla, Ex Parte*, 120 D.P.R. 61 (1987); *Martínez v. Rivera Hernández*, 116 D.P.R. 164 (1985); *Otero Fernández v. Alguacil*, 116 D.P.R. 733 (1985); *Key Nieves v. Oyola Nieves*, 116 D.P.R. 261 (1985); *Guadalupe Viera v. Morell*, 115 D.P.R. 4 (1983); *Milán Rodríguez v. Muñoz*, 110 D.P.R. 610 (1981); *Fernández v. Davison*, 80 D.P.R. 253 (1958). La subvención económica que brinda el Departamento de Servicios Sociales, como antes indicamos, es "para cubrir los gastos de alimentación, ropa, artículos de uso personal, gastos mensuales, juguetes, juegos, recreación, efectos escolares, ropa de cama para el niño, servicios médicos de emergencia, transportación, gastos misceláneos". Véase Manual de Normas y Procedimientos para los Servicios del Programa de Servicios a Familias con Niños, ante, Cap. VI, pág. 63. Ese estipendio es para los gastos rutinarios que conlleva la crianza de *todo* niño y ayuda al sostenimiento del menor.

El Art. 142 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 561, por su parte, define "alimentos" como

> ... todo lo que es indispensable para el sustento, habitación, vestido y asistencia médica, según la posición social de la familia.
> Los alimentos comprenden también la educación e instrucción del alimentista, cuando es menor de edad.

*Resulta evidente la similitud del concepto "alimentos" con el propósito que anima la subvención otorgada por el Departamento.* Esta última se utiliza para cubrir parte de los gastos de alimentación del menor en el hogar de crianza. Ambos conceptos recogen todas las necesidades

básicas de un ser humano, tanto físicas como intelectuales. *Guadalupe Viera v. Morell*, ante.

En *Negrón Rivera y Bonilla, Ex Parte*, ante, pág. 72, reconocimos que la "obligación alimenticia 'tiene su fundamento en el *derecho a la vida configurado como un derecho de la personalidad*' ". (Énfasis suplido y en el original.)[16] Nuestra casuística, a su vez, ha reiterado que el "deber de alimentos se funda en principios universalmente reconocidos de solidaridad humana *generados por el derecho natural a la vida* e imperativos de los vínculos familiares". *Martínez v. Rivera Hernández*, ante, pág. 168 ; *Milán Rodríguez v. Muñoz*, ante; J. Santos Briz, *Derecho Civil*, Madrid, Ed. Rev. Der. Privado, 1982, T. V., págs. 439–441. En *Milán Rodríguez v. Muñoz*, ante, págs. 613–614, nos hicimos partícipes de las palabras del comentarista Manresa, al declarar:

> "El ser humano, que viene a la vida con el destino que le señale su propia naturaleza, tiene un derecho a la existencia y al desarrollo de la misma según sus facultades; es decir, tiene un derecho absoluto a su conservación. En la organización actual de la familia y de la sociedad se halla impuesta, primero a los parientes y después al Estado, la obligación de proveer a dicha necesidad; y cada uno en su caso está en el deber de procurar al que por sí no podría cumplir dicho fin, los medios necesarios para su conservación y desarrollo: deber altamente social, que no depende de la voluntad del que le tiene, sino que se impone a todos como una de las condiciones necesarias de la vida progresiva de la humanidad." J.M. Manresa y Navarro, *Comentarios al Código Civil Español*, Madrid, Ed. Reus, 1956, Vol. I, págs. 782–783.

La Asamblea Constituyente del Estado Libre Asociado de Puerto Rico, al redactar la frustrada Sec. 20 del Art. II de la Constitución del Estado Libre Asociado, L.P.R.A.,

---

[16] S. Torres Peralta en su artículo *La ley especial de sustento de menores y el derecho de alimentos en Puerto Rico*, 49 (Núms. 3–4) Rev. C. Abo. P.R. 17, 25 (1988), reconoce que el derecho de reclamar alimentos es uno de raíces constitucionales como parte del derecho a la vida.

Tomo 1, ed. 1982, pág. 333,([17]) reconoció "[e]l derecho de toda persona a disfrutar de un nivel de vida adecuado que asegure para sí y para su familia la salud, el bienestar y especialmente *la alimentación*, el vestido, la vivienda, la asistencia médica y los servicios sociales necesarios". (Énfasis suplido.)([18])

En *Amy v. Adm. Deporte Hípico*, 116 D.P.R. 414, 421 (1985), expresamos que "[e]l destino incierto de la frustrada Sec. 20 de nuestra Constitución, late entre aquellos derechos que aunque no se mencionan expresamente en el texto, el pueblo se reserva frente al poder político creado. Véanse: Constitución de Estados Unidos de América, Emda. Art. IX; Constitución del Estado Libre Asociado, Art. II, Sec. 19; *Ortiz Cruz* v. *Junta Hípica*, 101 D.P.R. 791, 794–795 (1973). 4 Diario de Sesiones, *supra*, págs. 2530–2532, 2539–2543, 2575–2577". La Asamblea Constituyente tuvo muy presente el alcance del concepto "vida" como derecho inalienable del hombre. A esos efectos, uno de los delegados expresó:

"... La palabra 'vida' contiene toda una serie de derechos aparte del de la simple respiración que no están incluidos necesariamente en la palabra 'libertad' ni en la palabra 'propiedad'. O sea, de eliminarse la palabra 'vida' de esta frase tan consagrada en la historia de este gran derecho, se estaría haciendo un cambio fundamental en cuanto [a eso], principalmente ahora que se está expandiendo el área de los derechos humanos y ahora que se está reconociendo una segunda carta de derechos a la ante-

---

([17]) Por la Resolución Núm. 24, aprobada por la Convención Constituyente, ratificada en el Referendum de 4 de noviembre de 1952, fue eliminada la Sec. 20 del Art. II de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1. R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, 1ra ed., San Juan, Ed. C. Abo. P.R., 1986, Vol. I, pág. 731.

([18]) Merece señalarse, y enfatizarse, el hecho de que en la citada, y frustrada, Sec. 20 de la Constitución se hizo claramente constar que los "derechos consignados en esta sección están íntimamente vínculados al desarrollo progresivo de la economía del Estado Libre Asociado *y precisan, para su plena efectividad, suficiencia de recursos y un desenvolvimiento agrario-industrial que no ha alcanzado la comunidad puertorriqueña*". (Énfasis suplido.) Art. II, Sec. 20, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, págs. 333–334.

rior clásica, tipo siglo XVII, y se están significando como derechos del hombre también en este documento, el derecho a la educación, el derecho al trabajo, el derecho a un nivel adecuado de vida.

Todos estos derechos que abonan y que son necesarios para el debido desenvolvimiento de la personalidad humana están comprendidos fundamentalmente en la palabra 'vida'. *Y es la cláusula de debido proceso de ley, ciertamente, el principal escudo histórico para su defensa.* (Énfasis suplido.) (Hon. José Trías Monge), 2 Diario de Sesiones, *supra,* págs. 1503–1504." (Énfasis en el original.) *Amy v. Adm. Deporte Hípico,* supra, págs. 421–422.

Se infiere de nuestra casuística, al igual que de nuestra Constitución, *que el derecho a recibir alimentos de los menores es parte del derecho a la vida.* Este es parte del derecho inalienable del hombre, a su existencia y desarrollo. P. Beltrán de Heredia de Onís, *La obligación legal de alimentos entre parientes,* Salamanca, Ed. Anaya, 1958, pág. 33; M. Albaladejo, *Comentarios al Código Civil y compilaciones forales,* Madrid, Ed. Edersa, 1982, T. II, V. II, Art. 142, pág. 30.([19])

▆▆▆▆▆ El derecho a reclamar alimentos, como parte del derecho a la vida, tiene profundas raíces constitucionales. Este *derecho fundamental* se acentúa cuando están envueltos alimentos de menores y forma parte del poder de *parens patriae* del Estado. *González v. Suárez Milán,* 131 D.P.R. 296 (1992); *Rivera Maldonado v. Cabrera Olivera,* 130 D.P.R. 39 (1992); *Robles v. Otero de*

---

([19]) En el Derecho español, al igual que en otros países, se ha discutido el alcance de la responsabilidad alimenticia. Algunos autores sostienen que ésta surge del derecho a la vida, otros del vínculo parental o del interés público. J. Castán Tobeñas, *Derecho Civil español común y foral,* 9na ed., Madrid, Ed. Reus, 1985, T. 5, Vol. II. Sánchez Román apunta que se acepta el derecho a la vida como fundamento de la prestación alimenticia, señalando que el hombre, como ser ético, tiene que cumplir un destino, cuya realización exige como condición primera y esencial la de su existencia y, por tanto, la posibilidad de la conservación de su vida; así, en los primeros años y aún después si sobreviven ciertas causas han de arbitrarse los medios para realizar el derecho a la vida y alguien ha de proporcionarle los alimentos necesarios a dicho fin ...". Castán Tobeñas, *op. cit.,* 2da ed., pág. 1203; Castán Tobeñas, *op. cit.*

*Ramos*, 127 D.P.R. 911 (1991); *Piñero Crespo v. Gordillo Gil*, 122 D.P.R. 246 (1988); *López v. Rodríguez*, 121 D.P.R. 23 (1988); *Negrón Rivera y Bonilla, Ex parte*, ante; *Rodríguez Avilés v. Rodríguez Beruff*, 117 D.P.R. 616 (1986); *Quiñones v. Jiménez Conde*, 117 D.P.R. 1 (1986); *Milán Rodríguez v. Muñoz*, ante; *Sosa Rodríguez v. Rivas Sariego*, 105 D.P.R. 518 (1976). En nuestra jurisdicción los menores tienen un *derecho fundamental* a recibir alimentos. *Este derecho fundamental a reclamar alimentos, cobija tanto a los menores que viven en hogares de crianza de particulares, así como a aquellos que son ubicados en hogares de familiares. No puede ser de otra manera.*

■ Este Tribunal ha expresado que "[a]unque el estado *no tiene el deber* de proveer asistencia pública a todos los ciudadanos, una vez ofrece estos beneficios, los requisitos de elegibilidad no pueden ser arbitrarios ni pueden obligar a los ciudadanos elegibles renunciar a sus derechos fundamentales para poder participar en el programa ni penalizarlos por hacer valer sus libertades". (Énfasis suplido.) *Morales Morales v. E.L.A.*, 126 D.P.R. 92, 105 (1990). En el día de hoy reiteramos dichos pronunciamientos. Véase, en adición, K.M. Sullivan, *Unconstitutional Conditions and the Distribution of Liberty*, 26 San Diego L. Rev. 327 (1989).

## V

■ La Carta de Derechos de la Constitución del Estado Libre Asociado reconoce como derechos fundamentales del ser humano *el derecho a la vida*, a la libertad y al disfrute de la propiedad. Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1. Se reconoce además que: "La dignidad del ser humano es inviolable. Todos los hombres son iguales ante la Ley." Art. II, Sec. 1, Const. E.L.A., ante, pág. 257. El propósito de dicha Sección es "fijar claramente

como base consustancial de todo lo que sigue el principio de la dignidad del ser humano, y como consecuencia de ésta, la igualdad esencial de todas las personas dentro de nuestro sistema constitucional". Informe de la Comisión sobre la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico, 14 de diciembre de 1951. La mencionada Sec. 7 del Art. II de nuestra Constitución, ante, nos garantiza *que no se negará a persona alguna la igual protección de las leyes.*

Al amparo de la cláusula sobre igual protección de las leyes, no se puede aprobar una ley o norma, o *poner en vigor una práctica,* que establezca un trato desigual para algunos ciudadanos a menos que exista una razón justificada para ello. *Marina Ind., Inc. v. Brown Boveri Corp.,* 114 D.P.R. 64 (1983); *Vda. de Miranda v. Srio. de Hacienda,* 114 D.P.R. 11 (1983); *Alicea v. Córdova,* 117 D.P.R. 676 (1986). En Puerto Rico, al enfrentarnos a una legislación o práctica que clasifica a los individuos o a los grupos, este Tribunal ha utilizado uno (1) de dos (2) criterios o escrutinios establecidos jurisprudencialmente en otras jurisdicciones. Estos son: el escrutinio estricto *o* el tradicional mínimo, conocido también como análisis racional. *Vélez v. Srio. de Justicia,* 115 D.P.R. 533 (1984); *León Rosario v. Torres,* 109 D.P.R. 804 (1980); *Zachry International v. Tribunal Superior,* 104 D.P.R. 267 (1975).

 Al analizar clasificaciones relativas a cuestiones sociales y económicas, consistentemente hemos aplicado el escrutinio tradicional. Como es sabido, al amparo de dicho escrutinio, las clasificaciones establecidas por el legislador no se declararán inválidas a menos que sean claramente arbitrarias y no afecten un interés legítimo que establezca un nexo racional entre la clasificación impugnada y el interés perseguido. *León Rosario v. Torres,* ante. Bajo este escrutinio, la ley impugnada goza de una presunción de constitucionalidad. *Zachry International v. Tribunal Supe-*

*rior*, ante; *Wackenhut Corp. v. Rodríguez Aponte*, 100 D.P.R. 518 (1972).

■ Cuando la clasificación legislativa o la práctica administrativa afecta *derechos fundamentales* del ciudadano o establece clasificaciones inherentemente sospechosas se aplicará el escrutino estricto. *Wackenhut Corp. v. Rodríguez Aponte*, ante; *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715 (1980). Este análisis es en extremo riguroso y bajo su interpretación la ley impugnada se presumirá inconstitucional. Ante dicho escrutinio la ley o práctica será sustentada únicamente si: (1) afecta un interés apremiante; (2) la clasificación es necesaria para lograr el propósito deseado; (3) no exista un medio menos oneroso para alcanzar el propósito perseguido, y (4) exista una estrecha relación entre la ley o práctica y el propósito que se persigue. *Zachry International v. Tribunal Superior*, ante; *Brown v. Board of Education*, 347 U.S. 483 (1954); *Loving v. Virginia*, 388 U.S. 1 (1967). Una vez se prueba que un requisito de un programa de asistencia pública afecta un derecho fundamental, corresponde al Estado demostrar la existencia de un "interés colectivo de superior jerarquía" y que la condición promueve su consecución. *Morales Morales v. E.L.A.*, ante.

■ Un derecho fundamental es aquel que está reconocido expresa o implícitamente en la Constitución. *San Antonio v. Rodríguez*, 411 U.S. 1 (1973); *León Rosario v. Torres*, ante. La Constitución del Estado Libre Asociado reconoce como derechos fundamentales: la igualdad ante la ley, el derecho al voto, la libertad de culto, la libertad de expresión, *el derecho a la vida*, el derecho a la protección de ley contra ataques abusivos a la honra y el derecho a la intimidad. *González v. Ramírez Cuerda*, 88 D.P.R. 125 (1963); *Aponte Martínez v. Lugo*, 100 D.P.R. 282 (1971); *Cortés Portalatín v. Hau Colón*, 103 D.P.R. 734 (1975); *Colón v. Romero Barceló*, 112 D.P.R. 573 (1982); *P.R. Tel. Co.*

*v. Martínez*, 114 D.P.R. 328 (1983); *Arroyo v. Rattan Specialties, Inc.*, 117 D.P.R. 35 (1986); *P.R.P. v. E.L.A.*, 115 D.P.R. 631 (1984). Jurisprudencialmente se han adicionado, entre otros, el derecho a procrear, a viajar entre estados y a tener asistencia de abogado ante una acusación criminal. *Shapiro v. Thompson*, 394 U.S. 618 (1969); *Skinner v. Oklahoma*, 316 U.S. 535 (1942); *Gideon v. Wainwright*, 372 U.S. 353 (1963). Como doctrina general que gobierna esta situación, expone el Prof. Laurence H. Tribe: "Las clasificaciones legislativas deben someterse a un escrutinio estricto y su inconstitucionalidad decretarse en ausencia de una justificación gubernamental apremiante si las mismas distribuyen beneficios, o cargas, de una manera incompatible con los derechos fundamentales." (Traducción nuestra.) L.H. Tribe, *American Constitutional Law*, Nueva York, Ed. Foundation Press, 1978, pág. 1002.

En el presente caso el Departamento ha establecido una práctica administrativa para distribuir los fondos de alimentos a los niños colocados en hogares de crianza *que afecta su derecho fundamental a ser alimentados*. El Estado alega que existe un interés apremiante, que justifica la práctica discriminatoria; esto es, el propiciar que aparezcan familias que estén dispuestas a cuidar los menores. La subvención dada por el Departamento es vista por dicha agencia como un incentivo. No podemos perder de perspectiva, sin embargo, que el propósito de la subvención es la de ayudar a la alimentación del niño. *El interés de alimentar a los niños es de superior jerarquía que el de conseguir que personas, no familiares de los niños, se comprometan a cuidarlos temporalmente.* Los alimentos deben ser distribuidos de acuerdo con la necesidad de los menores. No le podemos negar el beneficio de la subvención a estos menores por tan sólo tener unos lazos afectivos previos con las personas que cuidan de ellos. *La práctica del Departamento, de hecho, está, a su vez, en contra de los*

*mejores intereses de los menores y de su estabilidad en el aspecto emocional, ya que propicia que éstos sean colocados en hogares de no familiares.*

El hogar de la Sra. Lydia Rodríguez fue evaluado satisfactoriamente por el Departamento; los menores fueron colocados en su hogar ante una situación de emergencia de protección de menores al amparo de la Ley Núm. 75 de 28 de mayo de 1980, ante. Los niños Beny Rosario, Lumarie y Migdalia Rodríguez Cournier tienen derecho a ser subvencionados por el Departamento mientras vivan en un hogar de crianza y necesiten ayuda para su alimentación, independientemente del hecho que la señora Rodríguez sea o no familiar de ellos.

Resolvemos que la práctica del Departamento de Servicios Sociales de denegarle la subvención a los menores que viven en hogares de crianza, pertenecientes a familiares, es irrazonable e inconstitucional. La clasificación establecida, la cual afecta un derecho fundamental, *no* supera el criterio del escrutinio estricto, pues el Estado no ha demostrado la existencia de un interés colectivo de superior jerarquía que justifique la misma. *Morales Morales v. E.L.A.*, ante. En consecuencia, *se dictará sentencia confirmatoria de la emitida por el tribunal de instancia.*

El Juez Presidente Señor Andréu García concurrió con el resultado sin opinión escrita. El Juez Asociado Señor Hernández Denton concurrió con el resultado mediante una opinión escrita. El Juez Asociado Señor Fuster Berlingeri disintió sin opinión escrita.

— O —

Opinión concurrente emitida por el Juez Asociado Señor Hernández Denton.

Concurro con el resultado pero no con los fundamentos

de la opinión de la mayoría por entender que no era necesario abordar la cuestión constitucional para resolver la controversia ante nos. A mi juicio, la práctica del Departamento de Servicios Sociales es *ultra vires* porque carece de autoridad en las leyes pertinentes o en los reglamentos que las implantan. Ni la Ley de Bienestar Público de Puerto Rico, según enmendada, 8 L.P.R.A. sec. 1 *et seq.*, ni la Ley Núm. 18 de 6 de julio de 1978, según enmendada, 8 L.P.R.A. sec. 68 *et seq.*, sobre instituciones para el cuidado de niños, ni la Ley de Protección a Menores, según enmendada, 8 L.P.R.A. sec. 401 *et seq.*, ni sus respectivos reglamentos (Reglamento para el Licenciamiento y Supervisión de Establecimientos para Niños Núm. 4758 de 19 de agosto de 1992; Manual de Normas y Procedimientos para los Servicios del Programa de Servicios a Familias con Niños, Servicios de Hogares Sustitutos, Revisión de 16 de marzo de 1984, Cap. VI) autorizan al Departamento a no subvencionar a aquellos menores bajo su custodia legal que coloca bajo la custodia de facto de hogares de crianza pertenecientes a sus familiares. Ante esta carencia de autoridad, entiendo que es innecesario dilucidar la constitucionalidad de una práctica que de por sí es *ultra vires*.