El Pueblo de Puerto Rico, demandante y recurrido, *v.* Reinaldo Rivera Morales, acusado y peticionario.

*Número:* CE-90-510          *Resuelto:* 26 de mayo de 1993

*José A. Gutiérrez Núñez*, abogado del acusado y peticionario; *Norma Cotti Cruz, Subprocuradora General*, y *Blanca A. Díaz Segarra, Procuradora General Auxiliar*, abogadas de El Pueblo.

EL JUEZ ASOCIADO SEÑOR FUSTER BERLINGERI emitió la opinión del Tribunal.

Se cuestiona ante nos la constitucionalidad del Art. 95(d) del Código Penal de Puerto Rico, 33 L.P.R.A. sec. 4032(d) (Sup. 1987). Al amparo de la garantía sobre la igual protección de las leyes, se plantea que la disposición aludida —agravando el delito de agresión cuando éste lo comete un varón adulto contra la persona de una mujer— establece un discrimen impermisible por razón de sexo.

I

El 23 de agosto de 1989 el Ministerio Público presentó una denuncia contra Reinaldo Rivera Morales por infracción al Art. 95 del Código Penal, 33 L.P.R.A. sec. 4032 (Sup. .1987). Se imputó como agravante en dicha denuncia que la agresión fue cometida por un varón adulto contra la persona de una mujer.

El 5 de febrero de 1990 el acusado solicitó la desestimación y el archivo de la denuncia, alegando que el estatuto aludido, al establecer un discrimen por razón de sexo, le negaba la igual protección de las leyes. El 5 de mayo de 1990 el tribunal declaró sin lugar la moción del acusado.

No estando conforme con la determinación del Tribunal de Distrito, el acusado presentó una petición de *certiorari* ante el Tribunal Superior, Sala de Aibonito, reiterando su alegación sobre la inconstitucionalidad del Art. 95(d), *supra*. El Ministerio Público, por su parte, expuso su posición mediante escrito.

El 10 de marzo de 1990 el Tribunal Superior declaró sin lugar el recurso presentado por el acusado, razón por la

cual posteriormente apeló ante nos, planteando lo siguiente:

> Cometió error el Honorable Tribunal Superior, Sala de Aibonito al denegarle la petición de certiorari al amparo de la igual protección de las leyes hecha por el acusado atacando la constitucionalidad del Artículo 95(E) [sic] del Código Penal de Puerto Rico, ya que la misma establece un discrimen por razón de sexo y ya que el estado no demostró la existencia de un interés apremiante que justifique la clasificación y que dicha clasificación sea necesaria para la consecución de ese interés. Petición de *certiorari*, pág. 3.

## II

Reiteradamente hemos resuelto que en Puerto Rico nuestra Constitución no sólo garantiza la igual protección de las leyes sino que, contrario a la federal, también prohíbe expresamente el discrimen por razón de sexo. *Wackenhut Corp. v. Rodríguez Aponte*, 100 D.P.R. 518 (1972); *Zachry International v. Tribunal Superior*, 104 D.P.R. 267 (1975); *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715 (1980); *Milán Rodríguez v. Muñoz*, 110 D.P.R. 610 (1981). La razón de ser de esta prohibición constitucional fue claramente expresada en el Informe de la Comisión de la Carta de Derechos de la Asamblea Constituyente, 4 Diario de Sesiones de la Convención Constituyente 2561–2562 (1952), en el cual se indicó lo siguiente:

> *Sexo:— El propósito es reconocer el advenimiento de la mujer a la plenitud del derecho y a la igualdad de oportunidades con el hombre.* Dificultades actuales como las que descalifican a la mujer para ser jurado no podrán prevalecer frente a esta disposición. Por otra parte, no se trata aquí de cambiar, por ejemplo, la organización de la sociedad de gananciales porque en ella corresponda al marido y no a la esposa la posición de administrador. *Las disposiciones relativas al estado matrimonial y a la comunidad de bienes resultante de éste no entran en juego en este punto.* Esa cuestión queda para examen legislativo. Tampoco se trata en el primer ejemplo de que la mujer tenga que ser jurado y que no podrá excusarse de ese

servicio ni por sí misma ni por elección legislativa. *Se trata de eliminar una descalificación*; no de imponer una obligación nueva. (Énfasis suplido.)

■ En virtud de este claro mandato constitucional de erradicar la desigualdad jurídica de la mujer, declaramos inconstitucional una disposición legislativa de índole laboral que tendía a negar a la mujer la igual oportunidad de trabajo respecto al hombre al establecer condiciones de empleo que hacían más atractivo para el patrono el seleccionar obreros varones. *Zachry International v. Tribunal Superior*, supra. Igualmente declaramos inconstitucional una disposición legislativa que exigía la corroboración del testimonio de la perjudicada en procesos por delito de violación porque imponía a priori trabas a la credibilidad de la mujer. *Com. de la Mujer v. Srio. de Justicia*, supra. Incluso, hemos extendido a ex cónyuges varones el ámbito protector de la disposición del Código Civil que provee para la pensión alimentaria de ex cónyuges femeninas que no tienen medios suficientes para vivir, por entender que la disposición en cuestión, según formulada originalmente, respondía a una concepción jurídica arcaica y limitante sobre la mujer. *Milán Rodríguez v. Muñoz*, supra. Hemos descartado no sólo tratos discriminatorios contra la mujer, sino hasta concepciones jurídicas desfasadas y estereotipadas que suponen supuestas inferioridades de la mujer.

■ Nada de lo anterior, sin embargo, significa que sea constitucionalmente inválida toda distinción legal fundamentada en el sexo. Como bien se ha señalado en el estudio fundamental de la Comisión de Derechos Civiles de Puerto Rico sobre este asunto (*La igualdad de derechos y oportunidades de la mujer puertorriqueña*, 1972-CDC-022, 22 Der. Civ. 583, 594 (1973)), "las diferencias fisiológicas que se dan entre los sexos pueden justificar legítimamente en algunas situaciones concretas el trato diferencial de la mujer y el varón". En nuestra propia jurisprudencia hemos reconocido, por ejemplo, que la maternidad es una base

legítima para conceder determinados derechos sólo al sexo femenino;([1]) y en *Zachry International v. Tribunal Superior*, supra, pág. 279, expresamente aceptamos la legitimidad del trato desigual justificado, al señalar lo siguiente:

Admitimos no obstante, que la Constitución reconoce, al igual que la propia naturaleza, diferencias por razón de sexo y permite las mismas si éstas no discriminan. En virtud de sus diversas disposiciones ... no pueden extenderse prohibiciones absolutas que impidan el ejercicio legítimo del poder de reglamentación del Estado para aprobar medidas razonables con el objetivo de salvaguardar el interés común. Una pieza legislativa debe sostenerse o anularse en orden a la dimensión, substancialidad y realidad de los principios comunitarios e individuales envueltos y los problemas sociales que intenta corregir. (Escolio omitido.)

Este cardinal pronunciamiento normativo lo reiteramos expresamente en *Com. de la Mujer v. Srio. de Justicia*, supra, pág. 728.

### III

El Art. 95 del Código Penal, *supra*, dispone lo siguiente:

Agresión agravada

La agresión se considera agravada aparejando pena de reclusión por un término que no excederá de seis [(6)] meses o multa máxima de quinientos [(500)] dólares; o ambas penas a discreción del tribunal, si se cometiere con la concurrencia de cualquiera de las siguientes circunstancias:

(a) Cuando se cometa en la persona de un funcionario público en el cumplimiento de sus deberes, o como consecuencia de éstos, en caso de saberse o haberse hecho saber a la persona que cometiere el hecho que la persona agredida era un funcionario público o en su presencia.

(b) Cuando se cometiere en un tribunal de justicia o en cualquier sitio dedicado al culto o a las prácticas religiosas o en

---

([1]) Véase *Ponce Candy Industries v. Corte*, 69 D.P.R. 417 (1948), cuya continuada validez ratificamos en *Zachry International v. Tribunal Superior*, 104 D.P.R. 267, 279 esc. 13 (1975).

algún lugar donde se hallaren reunidas varias personas con fines lícitos.

(c) Cuando se cometiere por una persona robusta en la de un anciano o decrépito.

(d) Cuando se cometiere por un varón adulto en la persona de una mujer o niño, o por una mujer adulta en la de un niño menor de 16 años de edad.

(e) Cuando se cometiere con la intención de inferir grave daño corporal.

(f) Cuando se cometiere por un funcionario público so color de autoridad y sin causa legítima.

(g) Cuando se cometiere por una o más personas haciendo uso de ventaja indebida.

Se considerará la agresión agravada como delito grave aparejando pena de reclusión por un término fijo de 3 años:

(a) Cuando la persona entre en la morada de una persona y cometiere allí la agresión.

(b) Cuando se infiere grave daño corporal a la persona agredida.

(c) Cuando se cometiere con armas mortíferas en circunstancias que no revistiesen la intención de matar o mutilar.

De mediar circunstancias agravantes la pena fija establecida podrá ser aumentada hasta un máximo de cinco (5) años; de mediar circunstancias atenuantes podrá ser reducida hasta un mínimo de dos (2) años.

El tribunal podrá imponer la pena de restitución en adición a la pena de reclusión establecida, o ambas penas.

Como puede observarse, dicho artículo establece varias circunstancias en las cuales una agresión determinada se considera agravada, aparejando así la posibilidad de una pena de reclusión que no existe si sólo se comete el delito de agresión simple.

■ El referido artículo proviene del Código Penal de Puerto Rico de 1904 y ha subsistido con enmiendas en todas las múltiples revisiones y reformulaciones que ha tenido el derecho penal de Puerto Rico desde entonces. Debe destacarse que la modalidad de la agresión agravada, que nos ocupa, sobrevivió la reforma sustancial que sufrió el Código Penal en 1974, al igual que las revisiones efectuadas en el propio articulado sobre el delito de agresión en 1971 y 1983. Ello es muy significativo porque demuestra

que la Asamblea Legislativa, en las tres ocasiones después de la adopción de nuestra Constitución en que han considerado cambios referentes al delito de agresión, *no ha encontrado tacha o defecto constitucional alguno* en la modalidad de agresión agravada en cuestión. Aunque la determinación final sobre el alcance y sentido de la Constitución es facultad nuestra (*Dapena Thompson v. Colberg Ramírez*, 115 D.P.R. 650 (1984); *Peña Clos v. Cartagena Ortiz*, 114 D.P.R. 576 (1983)), la interpretación inicial que de la Constitución hagan las ramas políticas del Gobierno merece deferencia (*Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986)), y respeto (*Rosado v. Rivera*, 81 D.P.R. 158, 186 esc. 56 (1959), opinión concurrente del Juez Asociado Señor Serrano Geyls), y debemos tenerla en cuenta porque descansa sobre ella el conocido principio de que un estatuto se presume constitucional hasta que este Tribunal resuelva lo contrario (*Cerame-Vivas v. Srio. de Salud*, 99 D.P.R. 45 (1970); *Esso Standard Oil v. A.P.P.R.*, 95 D.P.R. 772 (1968); *Pueblo v. Pérez Méndez*, 83 D.P.R. 539 (1961)).

Un análisis contextual del Art. 95, *supra*, así como de su extenso historial[2] revela que mediante éste se persigue la consecución de varios propósitos legislativos estrechamente relacionados entre sí. A través de este artículo, el legislador procuró diferenciar los castigos a imponérsele a diversos tipos de agresores por los daños causados a sus víctimas, estableciendo penas de distinta severidad, según la *gravedad objetiva* del daño causado y según el *grado de malicia* aparejado por la conducta antijurídica del agresor.[3] Pero es evidente que lo anterior no es todo lo que quiso lograr el legislador. Es patente, también, la intención de usar el poder disuasivo de la norma penal para tratar de evitar la agresión en determinadas circunstancias especí-

---

[2] Véase D. Nevares-Muñiz, *Código Penal de Puerto Rico*, San Juan, Ed. Rev. C. Abo. P.R., 1986, págs. 166–169.

[3] Véase Exposición de Motivos de la Ley Núm. 10 de 16 de septiembre de 1983, Leyes de Puerto Rico, págs. 388–389.

ficas donde ésta es particularmente deletérea o reprensible. En tales circunstancias, la agresión no sólo atenta contra la integridad corporal de alguna persona, sino que a la vez vulnera otros intereses sociales de especial jerarquía, reviste rasgos de especial peligrosidad *o se despliega en situaciones donde existe una conocida propensión al abuso*. Así, pues, en virtud del inciso (b) del Art. 95 (33 L.P.R.A. sec. 4032(b)) la agresión se considera agravada cuando ocurre en un tribunal de justicia o en una iglesia o templo, porque además del daño corporal a la víctima, se altera la paz de un lugar de especial solemnidad.[4] Se considera también agravada la agresión que se comete con armas mortíferas por la evidente peligrosidad especial que ella apareja.[5]

■ Los incisos (c) y (d) del Art. 95 (33 L.P.R.A. secs. 4032(c) y (d)) consideran cuatro circunstancias específicas que tienen un importante denominador común. La agresión aludida en estos incisos se considera agravada: (1) cuando se comete por una persona robusta en la de un anciano; (2) cuando se comete por una persona robusta en la de un decrépito; (3) cuando se comete por un adulto, varón o mujer, en la de un niño, y (4) cuando se comete por un varón adulto en la persona de una mujer, que es la que nos interesa en esta opinión. Estas cuatro circunstancias aluden todas a una situación en que el agresor aprovecha su ventaja física sobre la víctima. La agresión se considera particularmente reprensible tanto porque *hay mayor peligro para la víctima físicamente desventajada* como porque se trata de situaciones donde existe una conocida *propensión al abuso*. El legislador dispuso que en estas circunstancias la agresión debe considerarse agravada a fin de proteger adecuadamente el primordial interés público en salvaguardar la seguridad y la integridad corporal de estas

---

[4] *El Pueblo v. Marini*, 22 D.P.R. 11 (1915).

[5] *Pueblo v. Rodríguez Ocaña*, 88 D.P.R. 335 (1963).

personas *particularmente susceptibles a daños por agresión.*

## IV

A la luz de lo que hemos señalado antes, pasemos ahora a escrutar con el debido rigor si el legislador actuó constitucionalmente al disponer para la mujer la protección contenida en el inciso (d) del Art. 95, *supra.* ¿Existe aquí un trato desigual por razón de sexo que no tenga justificación suficiente? ¿Se denigra o socava de algún modo la igualdad jurídica de la mujer que nuestra Constitución consagró al ordenar que "[n]o podrá establecerse discrimen alguno por motivo de sexo"? Art. II, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 257.

■ No puede negarse que a primera vista parecería que en el inciso (d) del Art. 95 del Código Penal, *supra*, se establece un trato desigual contra el hombre. Si una mujer adulta agrede a un hombre, sin más, se configuraría el delito de *agresión simple*; en cambio, si un hombre adulto agrede igualmente a una mujer, el delito que se configura es el de *agresión agravada*. Ello parece tener el cariz de un trato desigual, sobre todo porque no puede negarse que físicamente hablando existen varones pequeños y débiles al igual que mujeres fuertes y grandes.(6)

Sin embargo, la cuestión jurídica ante nos no es meramente si existe aquí un trato desigual para el hombre por su condición como tal. La cuestión más bien es si tal trato desigual constituye un discrimen que no tiene una rigurosa justificación constitucional. Y nuestra respuesta a esta cuestión es que el trato desigual de marras está plenamente justificado.

Es un dato científico, comprobado empíricamente, que de ordinario los varones de la especie tiendan a ser física-

---

(6) Véase M. Arraiza Donate, *La constitucionalidad del agravante por sexo en la agresión agravada*, 47 Rev. C. Abo. P.R. 183 (1986).

mente más grandes y corpulentos que las mujeres. Desde el punto de vista de la *anatomía,* como regla general, la constitución de la mujer es más liviana y más grácil que la del hombre. Sus cuerpos tienen un por ciento menor de peso muscular; la estructura osea es más somera; el corazón y los pulmones son menores en proporción al tamaño del cuerpo. Como consecuencia de estas diferencias anatómicas, el metabolismo general de la mujer comúnmente es proporcionalmente más bajo que el del hombre y su fuerza total es menor. Véase A. Smith, *The Body,* Nueva York, Walker & Co., 1968, págs. 283–284.

Desde el punto de vista *psicológico* también es cierto que, de ordinario, el hombre es más agresivo que la mujer. Confrontados con situaciones comparables de reto, malestar o amenaza, el varón tiene mayor propensión a reaccionar con acometividad que la mujer. Estudios recientes realizados en prestigiosos centros de investigación de Estados Unidos sugieren que la mayor tendencia del varón hacia la conducta agresiva no es meramente aprendida, es decir, no es solamente producto de la socialización o del condicionamiento cultural, sino que parece ser también *innata*, atribuible a diferencias genéticas.[7] Una muestra de esta innegable realidad la ofrecen las estadísticas sobre las querellas que se presentan contra menores en el Tribunal Superior de Puerto Rico. Durante 1990–1991, por ejemplo, se presentaron 4,651 querellas contra menores de 17 años o menos. De éstas, *4,282 —es decir 92%— eran contra varones*. Informe Anual de la Rama Judicial 1990–1991, pág. A-43.

Los datos anteriores corroboran, por sí solos, la apreciación del legislador de que las mujeres son personas particularmente susceptibles a daños por agresión de parte del varón. Son suficientes para justificar la decisión legislativa

[7] Para un excelente recuento de los hallazgos principales de los estudios aludidos, véase el artículo titulado *Sizing Up The Sexes* publicado por la revista *Time* el 20 de enero de 1992.

de proteger el interés público primordial de salvaguardar la seguridad y la integridad de la mujer, específicamente frente a la peligrosa agresión del varón, tratando ésta como agravada. Pero hay datos adicionales de aún mayor importancia que es menester traer a colación. Como bien señaló la Juez Asociada Señora Naveira de Rodón en *Pueblo v. Esmurria Rosario*, 117 D.P.R. 884, 890 (1986), "[l]a violencia es uno de los problemas sociales más serios y alarmantes a que nos enfrentamos hoy en día[, p]articularmente la violencia contra la mujer en sus distintas manifestaciones ...". Según datos suministrados por la Policía de Puerto Rico a la Comisión para Asuntos de la Mujer, en 1991 se informaron en la isla *13,410* casos de violencia doméstica. De éstos, *12,593 —es decir el 93.9%— tenían a la mujer como víctima.* De enero a junio de 1992 se informaron 6,757 casos. De éstos, 6,297 —es decir el 93.2%— tenían a la mujer como víctima.[8] Esta trágica realidad no ocurre únicamente en Puerto Rico. En un estudio relativamente reciente de la Escuela de Medicina de la Universidad de Harvard se encontró que entre los cientos de pacientes ambulatorios de esa institución que habían estado involucrados en situaciones de violencia, *el 81% de las víctimas eran mujeres y la inmensa mayoría de los agresores eran varones.*[9]

Frente a este cuadro desolador de violencia contra la mujer no es posible considerar que el inciso (d) del Art. 95 del Código Penal, *supra*, pueda ser inconstitucional. No se trata de una medida basada en conceptos denigrantes sobre la mujer; no refleja nociones arcaicas o peyorativas de inferioridad o de abyecta "debilidad". Responde más bien a la innegable realidad de que las mujeres, en los casos de agresión, son en general particularmente suscep-

---

[8] Informe del Servicio Directo de la unidad Mujer en Crisis de la Comisión para los Asuntos de la Mujer.

[9] Herman, *Histories of Violence...*, 56 Am. Journal of Orthopsychiatry 137 (Jan. 1986).

tibles al abuso físico cuando las agrede un varón adulto, y que en nuestra sociedad existe un grave problema de violencia contra la mujer. *Véase, sobre este particular, el voto particular y de conformidad emitido por la Juez Asociada Señora Naveira de Rodón de este caso.* La disposición en controversia se sostiene, pues, como medio preciso para combatir un grave mal social. No cabe duda de que se trata de una medida legislativa que es necesaria para atender un interés gubernamental apremiante. Por el contrario, de no existir tal medida podría decirse con gran sentido jurídico que respecto a este asunto no se ha atendido siquiera mínimamente el mandato de protección a la mujer que dimana del Art. II, Sec. 1 de nuestra Constitución, *supra.*

Al aplicar como lo hemos hecho en este caso[10] el criterio de estricto escrutinio judicial al que hemos sujetado las clasificaciones basadas en sexo, hemos tenido en cuenta que dicho criterio, adoptado discrecionalmente por este Tribunal como iniciativa jurisprudencial propia, no es de aplicación mecánica, formalista o automática sino que, como señalamos tanto en *Zachry International v. Tribunal Superior*, supra, como en *Com. de la Mujer v. Srio. de Justicia*, supra, es una técnica de análisis para ayudar a dilucidar "los principios comunitarios envueltos y los proble-

---

[10] En la literatura sobre este tema (Arraiza Donate, *supra*, pág. 195) se ha argumentado que la disposición en cuestión es constitucionalmente muy restrictiva porque mediante ésta se presume inválidamente que la condición física del hombre *siempre* aventaja la de la mujer, ignorando así la situación donde un hombre pequeño y enclenque agrede a una mujer grande y fuerte, en la cual, alegadamente, no se justificaría la modalidad en cuestión de agresión agravada. Sobre este planteamiento debe decirse, en primer lugar, que no es enteramente cierto que exista la presunción aludida. Como hemos señalado ya, la modalidad de agresión agravada que nos concierne se basa en la propensión al abuso y en el problema social de la violencia contra la mujer, y no meramente en la ventaja física del varón. En segundo lugar, aun si fuese cierto que existe tal presunción, ello no sería pertinente aquí ya que el apelante no ha alegado que tal sea su caso. Es decir, el apelante no impugna la constitucionalidad del estatuto penal sobre la base de que en su caso no hubo ventaja física envuelta, sino sobre la base de que el estatuto en su *esencia* es inconstitucional. Se trata de un ataque *de su faz*, que presupone que en *cualquier circunstancia* el estatuto sería inválido, incluso en los casos donde un hombre robusto agrede a una mujer mucho más pequeña.

El planteamiento, pues, es inmeritorio.

mas sociales que se intentan corregir". Este criterio, pues, es sólo una herramienta conceptual conveniente. Al menos en casos de alegado discrimen por razón de sexo, no es de por sí una norma autónoma compelida por la Constitución. No tiene vida propia ni puede utilizarse al extremo de que sirva para derrotar precisamente los propósitos mismos que se quisieron lograr al establecerse en la Constitución la prohibición del discrimen contra la mujer. Constituiría un grave contrasentido utilizar la norma constitucional que ordena erradicar la desigualdad jurídica de la mujer para invalidar una disposición estatutaria que existe para proteger a la mujer contra los abusos del varón. Nada nos obliga a una "lógica" jurídica tan irónica y ofuscada, que conlleva trastocar el claro sentido y propósito del mandato constitucional. Desde esta óptica, y luego de escrutar rigurosamente el esquema legislativo impugnado ante nos, resolvemos que éste no es inconstitucional.

*Se confirma la sentencia dictada por el Tribunal Superior, Sala de Aibonito, el 6 de junio de 1990.*

. La Juez Asociada Señora Naveira de Rodón emitió un voto particular y de conformidad. El Juez Asociado Señor Negrón García disintió mediante opinión escrita. El Juez Asociado Señor Rebollo López disintió mediante opinión escrita, a la cual se unió el Juez Asociado Señor Hernández Denton.

— O —

Opinión disidente del Juez Asociado Señor Negrón García.

I

El Art. II, Sec. 1 de nuestra Constitución, L.P.R.A., Tomo 1, prohíbe expresamente . discriminar por razón de sexo. A su amparo, toda impugnación activa la fórmula de

estricta supervisión judicial —*Milán Rodríguez v. Muñoz*, 110 D.P.R. 610 (1981)— y, por ende, el Estado está obligado a probar que la clasificación legislativa tiene un propósito apremiante de beneficio al interés común, que no existen alternativas menos drásticas y, además, que es necesaria. *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715, 733 (1980).

Todos los jueces coincidimos en que el Art. 95(d) del Código Penal, 33 L.P.R.A. sec. 4032(d) (Sup. 1987) —que automáticamente considera agravada la "agresión cuando se comet[e] por un varón adulto en la persona de una mujer"— de su faz establece una clasificación basada en el sexo. No obstante, una mayoría se hace eco al argumento de que es razonable, pues descansa en la disparidad, superioridad física y propensión psicológica de agresividad del hombre hacia la mujer.

Incluso, una vez más, se pretende insuflar validez a una norma que atenta contra valores fundamentales, mediante el uso de un análisis histórico-literario que se remonta a tiempos de España. La futilidad de esa técnica adjudicativa quedó demostrada con la decisión del Tribunal Supremo de Estados Unidos de 17 de mayo de 1993 en *El Vocero de Puerto Rico et al. v. Comm. of Puerto Rico et al.*, Certification to the Supreme Court of Puerto Rico from the United States' Supreme Court Núm. 92-949. Allí se revocó a estos integrantes hoy de la mayoría y se abrieron las puertas de la vista preliminar al público.

## II

El bien jurídico tutelado por los Arts. 94 y 95 del Código Penal, 33 L.P.R.A. secs. 4031 y 4032 (Sup. 1987) es la integridad física de toda persona. La sanción es mayor cuando el peligro de sufrir daño corporal severo aumenta por la disparidad en fuerza física entre el sujeto activo y el pasivo. Tal sanción se traduce en un castigo más alto, lo

cual es legítimo. Sin embargo, el inciso (d) del Art. 95, *supra*, agrava la ofensa por el sólo hecho de que el sujeto activo es hombre y el pasivo, mujer. ¿A qué visión de la mujer responde?

Aceptamos que, de ordinario, el hombre es físicamente más fuerte que la mujer. Ahora bien, asumir que *siempre* es más débil que el hombre es simplemente falso. No obstante, *sin excepciones*, la referida legislación clasifica y le impone sólo al hombre la carga absoluta del agravante, *sin considerar que su condición física puede ser igual o inferior a la de la mujer agredida*. Tan es así, que las palabras "varón adulto" jurisprudencialmente siempre han significado persona mayor de veintiun (21) años. *El Pueblo v. Colón*, 25 D.P.R. 629 (1917).

Si una mujer agrede a un hombre más débil, ¿será agravada? ¿Bajo qué disposición de ley? La realidad es que no existe un precepto legal que tipifique esos hechos. Ese vacío legislativo equivale a sostener que socialmente, al decir mayoritario, no es "particularmente deletére[o] o represible" (opinión mayoritaria, pág. 452) el abuso cuando la mujer agrede al hombre. Nos enfrentamos, pues, a un "trato desigual basado en premisas subjetivas erróneas, tradicionales y estereotipadas que emanan de una visión masculina que —consciente o inconscientemente— tiene su razón de ser en la concepción y caracterización de la mujer como 'sexo débil' ". *Com. de la Mujer v. Srio. de Justicia*, supra, págs. 729–730.

Ese tratamiento diferencial es injustificado.[1] ¿Por qué el legislador no puede tutelar la cuestión usando el elemento circunstancial de que el agresor aprovecha su ventaja física sobre la víctima, según lo ha dispuesto expresamente con relación a personas robustas, que agreden ancianos o decrépitos?

---

[1] Nos preocupa la técnica mayoritaria de usar estadísticas sobre violencia doméstica. La *Ley para la Prevención de la Violencia Doméstica*, Ley Núm. 54 de 15 de agosto de 1989 (8 L.P.R.A. sec. 601 *et seq.*), es un ejemplo de cómo puede atenderse un problema que aqueja principalmente a la mujer utilizando un lenguaje no sexista.

## III

A poco examinemos, la opinión mayoritaria se apuntala no sólo en la premisa de la superioridad física del hombre frente a la mujer, sino "[en que d]esde el punto de vista psicológico ... de ordinario, el hombre es más agresivo ...". (Énfasis suprimido.) Opinión mayoritaria, pág. 454. Para la mayoría esta tendencia es *"innata*, atribuible a diferencias genéticas". Íd. Para sostener este último y cuestionable aserto —crucial en su análisis— como fuentes de autoridad aluden curiosamente a unos estudios realizados en Estados Unidos objeto de mención en la revista *Time*; de Puerto Rico sólo hacen referencia a "querellas contra menores *de 17 años o menos*". (Énfasis suplido.) Íd. La inaplicabilidad de esos datos y su poco valor persuasivo en nuestro medio ambiente es evidente. A nivel psicológico, ¿podemos generalizar y equiparar la agresividad del *varón* adulto puertorriqueño con la del norteamericano? ¿Apoyarla a base de los *menores de edad* puertorriqueños?(²)

El abuso y la agresión física hacia una mujer es una *infamia*. Sin embargo, su clasificación basada únicamente en el sexo para conceder, sin otros fundamentos, el carácter de delito agravado constituye un trato desigual inconstitucional contra el hombre. Sería distinto si se hiciera en virtud de alegaciones fácticas fundadas en el factor ventaja y abuso físico, lo cual representaría la alternativa menos drástica.

## IV

Es alarmante cómo la opinión mayoritaria, de un plumazo, destierra hoy de nuestro acervo doctrinario los sólidos criterios de escrutinio judicial. *Zachry International v.*

---

(²) Análisis que pasa por alto el fenómeno reconocido en la psicología moderna que explica por qué existe una mayor agresividad en la etapa de la adolescencia y temprana adultez.

*Tribunal Superior*, 104 D.P.R. 267, 277–278 (1975). En particular, queda menospreciada la importancia del *escrutinio estricto* al tildársele de simple "herramienta conceptual conveniente". Opinión mayoritaria, pág. 457. Rechazamos ese enfoque.

El descargo juicioso y ponderado que debe caracterizar toda revisión judicial —con mayor razón a nivel constitucional— requiere una metodología adjudicativa preestablecida y el uso de criterios objetivos racionales; no puede descansar en las preferencias personales desnudas del juzgador. Distinto al parecer mayoritario, los criterios de escrutinio judicial prevalecientes no responden sólo a meras consideraciones pragmáticas. Representan salvaguardas esenciales de legitimidad, intrínsecas al ejercicio del Poder Judicial en un sistema democrático. *Lo contrario es darle la bienvenida a la interpretación libre e inconsistente, e invitar, como compañera permanente de la dama Justicia, la sombra de la arbitrariedad.*

El resultado de esta laxitud interpretativa no se ha hecho esperar. Al elevar a categoría de dogma *la superioridad física masculina y su propensión psicológica a agredir a la mujer*, la mayoría realmente ha establecido en estos casos *una presunción de culpabilidad por razón de sexo.*

Más fácil hubiese sido —sobre todo *JUSTO*— bajo esos dos (2) predicados mayoritarios, haber ordenado al Ministerio Fiscal enmendar la denuncia contra Reinaldo Rivera Morales para imputárselos expresamente como agravantes.

No se crea conciencia pública ni se erradica un mal social con injusticias.

– O –

Opinión disidente emitida por el Juez Asociado Señor Rebollo López, a la cual se une el Juez Asociado Señor Hernández Denton.

Disentimos de la opinión mayoritaria que hoy emite este Tribunal en la cual se sostiene la validez constitucional del inciso (d) del Art. 95 del Código Penal de Puerto Rico, 33 L.P.R.A. sec. 4032(d) (Sup. 1987), *referente al agravante del delito de agresión cuando se comete por un varón adulto en la persona de una mujer.* Este inciso (d) establece, *de su faz,* una clasificación por razón de sexo que resulta *constitucionalmente impermisible* por no cumplir con los requisitos establecidos por la jurisprudencia para su validez.

A diferencia de la Constitución de Estados Unidos, nuestra Constitución *prohíbe expresamente* el discrimen por razón de sexo. Art. II, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1. Este Tribunal ha sido claro, y consistente, en su aplicación del criterio *de escrutinio estricto* en la revisión judicial de legislación que establece *clasificaciones a base de sexo.* Véanse: *Com. de la Mujer v. Srio. de Justicia,* 109 D.P.R. 715, 729 (1980); *Zachry International v. Tribunal Superior,* 104 D.P.R. 267 (1975); *Wackenhut Corp. v. Rodríguez Aponte,* 100 D.P.R. 518 (1972). Bajo este escrutinio, el estatuto impugnado se presumirá inconstitucional, *Rodríguez v. Depto. Servicios Sociales,* 132 D.P.R. 617 (1992); *Rodríguez Rodríguez v. E.L.A.,* 130 D.P.R. 562 (1992), *y su validez dependerá de que cumpla con los siguientes tres requisitos:*

1. Que el Estado demuestre la existencia de un propósito gubernamental apremiante o de la más alta jerarquía.

2. Que exista una relación o nexo entre la clasificación y el propósito gubernamental.

3. Que la clasificación sea la alternativa menos restrictiva del interés social protegido.([1])

## I

Pasamos a analizar el inciso (d) del referido Art. 95 a la luz de los tres (3) requisitos previamente expuestos:

### 1. *Existencia de un interés apremiante*

Al determinar la existencia del interés apremiante del Estado, y en atención a la presunción de inconstitucionalidad que cubre a todo estatuto sujeto a ser revisado judicialmente bajo el criterio de escrutinio estricto, *la labor de los tribunales al precisar cuál es la intención legislativa debe ceñirse a la cuidadosa indagación del historial legislativo y a un examen integral del lenguaje estatutario.* En su alegato, el Procurador General señala como "interés apremiante" lo siguiente:

> En particular, *los agravantes (c) y (d)* de las modalidades menos graves *contemplan la situación en que el agresor aprovecha su ventaja física sobre la de la víctima,* que puede ser un anciano o decrépito, o una mujer o un niño. La razón de estos agravantes es que por razón de la condición del sujeto pasivo, se entiende que el tipo de daño que se le causaría sería más severo.

> . . . . . . . .

> *Un examen del Artículo 95 demuestra que el legislador intenta prevenir la ocurrencia, por medio de una pena más severa, de agresiones que puedan causar grave daño corporal. Para asegurarse el objetivo del legislador, además, protege de forma especial entre otros a las mujeres frente a los hombres.*
> Es de conocimiento general, y los tribunales pueden tomar *conocimiento judicial,* que las mujeres, *por regla general, son*

---

([1]) *Comisión de la Mujer v. Srio. de Justicia,* 109 D.P.R. 715, 733 (1980); *Zachry International v. Tribunal Superior,* 104 D.P.R. 267, 277 (1975); *Rodríguez Rodríguez v. E.L.A.,* 130 D.P.R. 562 (1992); *Rodríguez v. Depto. Servicios Sociales,* 132 D.P.R. 617 (1993).

*físicamente menos robustas y más pequeñas que los hombres.* Que es más probable que una agresión por parte de un hombre .hacia una mujer cause una lesión seria que una agresión por parte de una mujer contra otra mujer. La disparidad física entre los sexos y por ende, *la ventaja física de uno sobre otro, es considerada la circunstancia que aumenta la peligrosidad del delito.* Por lo tanto, no estamos frente a un estatuto que penaliza con mayor rigurosidad a los miembros de un sexo irrespectivamente de la naturaleza de la ofensa. El estatuto en cuestión intenta proteger a la mujer de un peligro real, de que pueda ser objeto de grave daño corporal por parte de quien en general la aventaja físicamente. (Énfasis suplido.) Alegato del Procurador General, págs. 5 y 8–9.

Como podemos notar, según alega ante nos el Estado, el legislador intentó, mediante dicho. articulado, proteger las víctimas "débiles" de aquellos agresores que pudieran causarle grave daño corporal. La lectura integral del estatuto nos lleva a la misma conclusión. También así el breve historial legislativo disponible. En resumen, ese es el "interés apremiante" que venimos en la obligación de considerar al analizar el estatuto en controversia bajo el criterio de "escrutinio estricto".

*2 y 3. Que exista un nexo entre la clasificación y el propósito gubernamental y que tal clasificación sea la menos restrictiva u onerosa*

En la situación ante nos se cumple con el segundo requisito exigido en la medida en que se presume que la severidad de la sanción disminuirá la propensión a tales actos de agresión.

Sin embargo, a nuestro entender, el inciso (d) del Art. 95, *supra, no cumple con el tercer requisito* porque la clasificación por razón de sexo *no es el método menos oneroso para lograr el fin deseado por el Estado.* El interés del Estado en evitar las agresiones que produzcan grave daño corporal *no* guarda relación alguna con clasificaciones por razón de sexo. *Las diferencias en tamaño y fortaleza física entre los seres humanos no responden estrictamente a cri-*

*terios sexuales.* Aun cuando, como regla general, el varón es más grande y fuerte que la mujer, "no puede negarse que físicamente hablando existen varones pequeños y débiles al igual que mujeres fuertes y grandes". Opinión mayoritaria, pág. 453.

Resulta pertinente señalar que:

> ... [S]i el propósito del delito de agresión agravada es evitar el que hombres robustos ocasionen graves daños corporales a una mujer, no es necesario ni justificable hacer una clasificación a base de sexo para perseguir tal fin. Ello es así porque los incisos f y h del articulado de agresión agravada, 33 L.P.R.A. sec. 4032, incisos f y h respectivamente, promueven la concesión de ese interés público apremiante. El primero de los incisos de referencia establece como agravante el acometimiento y agresión cuando se infiriere grave daño corporal a la persona agredida, mientras que el otro inciso citado establece la circunstancia agravante cuando se cometiere con la intención de inferir grave daño corporal ... ninguna de dichas disposiciones clasifican discriminatoriamente por motivo de sexo, sancionando por otro lado con una pena mayor a aquellos hombres o mujeres que ocasionan o tratan de ocasionar graves daños corporales mediante agresión a otros seres humanos, fueren hombres o mujeres, o ambos." Véanse: Año 5 (Núm.4) Boletín Judicial (diciembre 1983); M. Arraiza Donate, *La constitucionalidad del agravante por sexo en la agresión agravada*, 47 Rev. C. Abo. P.R. 183, 197–198 (1986).

*Por otro lado*, la referida clasificación —referente a la calificación de la agresión cometida por un hombre contra una mujer— *resulta totalmente innecesaria a la luz de las propias disposiciones del citado Art. 95 del Código Penal.* Surge del *inciso (g)* de dicho artículo que la agresión se considera, igualmente, como "agravada" cuando "se cometiere por una o más personas *haciendo uso de ventaja indebida*". (Énfasis suplido.) 33 L.P.R.A. sec. 4032(g). En otras palabras, cuando una agresión se comete por un hombre de fuerzas corporales superiores a la de una mujer, *no* hay duda de que el hombre *ha hecho uso de una "ventaja indebida"*, lo cual hace que las disposiciones del inciso

(d), referentes al hombre y la mujer, *sean totalmente superfluas.*

En vista de lo arriba expuesto, somos del criterio que el inciso (d) del Art. 95, *supra,* aquí impugnado es inconstitucional de su faz. *El mismo no cumple con uno de los requisitos exigidos bajo el criterio judicial de escrutinio estricto.*

## II

En aras de *justificar o, más bien, enunciar* cuál es el interés apremiante que motivó al legislador a crear una clasificación por razón de sexo, la opinión mayoritaria indica que el Art. 95 *responde a dos (2) posibles intereses, a saber:* prevenir un grave daño corporal (postura asumida por el Procurador General) *y evitar situaciones donde existe una conocida propensión al abuso.*

Sin embargo, al pasar revisión judicial bajo el criterio de escrutinio estricto, *no* compete al Tribunal la búsqueda de los *posibles* intereses que podrían haber motivado al legislador, *sino los que en efecto lo motivaron.* Este Tribunal debe, por lo tanto, *abstenerse de especular* sobre la posible existencia de razones que pudieran válidamente haber movido al legislador. Esa tarea compete al Estado cuya actuación es impugnada y que bajo el criterio de escrutinio estricto queda cubierta de una presunción de inconstitucionalidad que debe ser salvada por los representantes del Estado y no por el Tribunal. Como ya hemos dicho, el Estado señala ante nos, *como su único interés,* la protección de víctimas "débiles" de aquellos agresores que pudieran causarle grave daño corporal. La opinión mayoritaria no tan sólo emprende la *impermisible tarea* de querer *suplir la intención legislativa* que podría, tal vez, salvar la constitucionalidad de la Ley de 10 de marzo de 1904 (33 L.P.R.A. sec. 821 *et seq.*), sino que va más allá *e imagina* cuál fue la intención legislativa que movió al legislador del estado de Texas a finales del siglo XIX —de donde nuestro

legislador adoptó el articulado en controversia— para establecer la clasificación aquí cuestionada; clasificación que, dicho sea de paso, fue eliminada posteriormente en Texas. Rechazamos esta acción del Tribunal por ser la misma contraria a un correcto proceder de revisión judicial bajo el criterio de escrutinio estricto.(²)

Nos parece *igualmente improcedente* la práctica judicial de recurrir a la historia y la literatura para *derivar* de éstas una *posible* intención legislativa que *ni* es la que se desprende del estatuto *ni* la que ha planteado el Estado ante nosotros. Recurrir a esta práctica es *particularmente peligroso* en casos en que, como aquí, existe *un conflicto entre un estatuto y un derecho fundamental* garantizado a todo individuo por nuestra Constitución. La existencia de este conflicto es *precisamente la razón* para someter la actuación gubernamental impugnada al más riguroso de los criterios de validez constitucional. *Si el Estado pretende válidamente interferir con el derecho de todo ciudadano a no sufrir discrimen por razón de sexo, éste debe ofrecer amplia, precisa y suficiente justificación para que bajo el más riguroso de los criterios de revisión judicial su actuación pueda desprenderse de la presunción de inconstitucionalidad que la acompaña.*(³) En nuestra opinión, recurrir a

---

(²) *Esta práctica corresponde a la revisión judicial bajo el "test" o criterio de razonabilidad, en el cual, con frecuencia, la búsqueda del propósito o interés del Estado sólo está limitada por la propia imaginación del tribunal.* L. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, pág. 1445. Tal proceder ha sido censurado por el Tribunal Supremo de los Estados Unidos en la aplicación de lo que hoy se conoce como el criterio de razonabilidad moderno de revisión judicial. *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985). Este criterio aunque es un tanto más rígido que el criterio de razonabilidad clásico, no llega al nivel de severidad del escrutinio estricto o acucioso.

(³) El análisis histórico y literario puede, a lo sumo, rendir *posibles* razones para que la Asamblea Legislativa actuara de determinada manera. Ciertamente, no debemos pretender que el mismo pueda producir de manera conclusiva la intensión del legislador. La utilización de este tipo de análisis es, en nuestra opinión, incompatible con la correcta aplicación del escrutinio estricto de revisión judicial. Recurrir a él, *sua sponte*, implica que el Tribunal ha asumido un rol activo en la búsqueda de fundamentos sobre los cuales sostener la validez de la actuación gubernamental impugnada, tal cual lo hace en ocasiones en que existe la presunción de constitucionalidad de la ley.

esta práctica resulta *particularmente inapropiado* en casos como el de autos, en la medida en que se crea la impresión de que el Tribunal se ha envuelto en un esfuerzo por justificar o encontrar fundamentos para sostener una postura adoptada con anterioridad a la aplicación del análisis jurídico bajo los criterios correspondientes.

De otra parte, observamos que la opinión mayoritaria, al *sugerir* que la intención legislativa fue evitar la violencia doméstica, trae a colación estadísticas de recientes años. A nuestro juicio *tal actuación es cronológicamente errada e inaceptable.* Conforme a lo previamente expresado, nada hay en el lenguaje del citado Art. 95 que nos lleve a pensar que el legislador estaba interesado en combatir la violencia doméstica o en reducir la alta incidencia de agresiones de hombres sobre mujeres en comparación con otros tipos de agresiones. *El estatuto, de su faz, no guarda relación alguna con este problema social moderno.*

Después de un examen integral del lenguaje estatutario y de su *breve* y *parco* historial legislativo, y en vista de los señalamientos que nos hace el Procurador General, como representante del Estado, con respecto al "interés apremiante" que persigue el Estado, *no podemos ni debemos* advertir que el interés del Estado al aprobar el Art. 95(d) del Código Penal, *supra*, fuere otro que el de evitar el grave daño corporal en víctimas débiles de agresores más fuertes y robustos. Como hemos señalado, establecer una clasificación a base de sexo *no es el medio menos oneroso para hacer realidad este propósito legislativo, como tampoco resulta necesario, por lo que tal clasificación es irrazonable y, por ende, inconstitucional.*

En síntesis, la concepción y generalización de la mujer como "débil" y necesitada de protección especial *es una visión paternalista incompatible con los legítimos derechos que la Constitución le confiere a la mujer como ser humano.* A esos efectos resulta acertado el siguiente señalamiento:

El inciso [d] del Artículo 95 del Código Penal de Puerto Rico

... responde a esquemas mentales y concepciones sociales desfasadas y falsas: la inferioridad física, mental y emocional de la mujer. Es innegable que, en su origen, el propósito era bueno, noble, y que el motivo del legislador fue una atención gentil y caballerosa acorde a los conceptos morales, sociales y legales de aquel tiempo. Ahora bien, ni la mujer es inferior al hombre ni *los buenos motivos del legislador hacen constitucional lo que no lo es.* Arraiza Donate, *supra*, pág. 197.

Por las razones expresadas, disentimos de la opinión mayoritaria.

— O —

Voto particular y de conformidad emitido por la Juez Asociada Señora Naveira de Rodón.

Compartimos el criterio expresado en la opinión mayoritaria a los efectos de que el inciso (d) del Art. 95 del Código Penal, 33 L.P.R.A. sec. 4032(d) (Sup. 1987), no es inconstitucional. Veamos por qué.

Nuestra Carta de Derechos en la Sec. 7 dispone que no "se negará a persona alguna en Puerto Rico la igual protección de las leyes". Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 275. Esta disposición no exige un trato igual para todos. Sí prohíbe el trato desigual injustificado. De manera que se pueden establecer diferencias en el trato, si éstas tienen una justificación objetiva. *Calo Morales v. Cartagena Calo*, 129 D.P.R. 102 (1991); *Almodóvar v. Méndez Román*, 125 D.P.R. 218 (1990). Por tal razón, el Estado puede hacer clasificaciones entre las personas sin violentar dicho principio siempre y cuando la clasificación sea razonable y promueva la consecución o protección de un interés público legítimo. El problema estriba en dictaminar cuándo la clasificación es razonable o no. *Zachry International v. Tribunal Superior*, 104 D.P.R. 267, 277 (1975). Para hacer tal determinación utilizamos

dos (2) criterios(¹) que han sido adoptados jurisprudencialmente. Ellos nos ayudan a examinar la razonabilidad de la clasificación en controversia. *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, 110 D.P.R. 248, 260 (1980). Estos criterios son el estricto y el tradicional o de nexo racional. *Vélez v. Srio. de Justicia*, 115 D.P.R. 533, 537 (1984).

El escrutinio estricto se utiliza cuando se está ante una clasificación sospechosa, o sea, aquellas que se establecen por motivo de raza, color, sexo, nacimiento, origen o condición social, ideas políticas o religiosas y nacionalidad. *Rodríguez Rodríguez v. E.L.A.*, 130 D.P.R. 562 (1992). Igualmente se utiliza este escrutinio cuando la ley afecta derechos fundamentales como el derecho al voto, a la libertad de culto y a la libertad de expresión, entre otros. *Rodríguez v. Depto. Servicios Sociales*, 132 D.P.R. 617 (1993). Al utilizar el escrutinio estricto se presume la inconstitucionalidad de la ley. Por lo tanto, el Estado tiene el peso de probar que existe un interés público apremiante que justifica la clasificación y que ésta promueve necesariamente la consecución de ese interés. *Rodríguez Rodríguez v. E.L.A.*, supra. Además, la clasificación deberá ser la alternativa menos onerosa para proteger el interés social deseado. *Rodríguez v. Depto. Servicios Sociales*, supra.

El escrutinio tradicional o de nexo racional se utiliza cuando se está ante la presencia de una legislación de índole socioeconómica. *Salas v. Municipio de Moca*, 119 D.P.R. 625, 632 (1987); *M. & B.S., Inc. v. Depto. de Agricultura*, 118 D.P.R. 319, 333 (1987). Según este escrutinio, la ley se presume constitucional, de modo que quien alega

---

(¹) Aunque en Puerto Rico aún no lo hemos adoptado, en otras jurisdicciones se utiliza también el escrutinio intermedio. Este se usa cuando la clasificación que hace el legislador afecta "intereses individuales importantes". *León Rosario v. Torres*, 109 D.P.R. 804, 814 (1980). El mismo requiere que la clasificación adelante un legítimo interés gubernamental y que esté sustancialmente relacionada con dicho interés. 3 *Treatise on Constitutional Law: Substance and Procedure* Sec. 18.3, pág. 17 (1992). Véase también la opinión disidente del ex Juez Presidente Señor Pons Núñez en *Pueblo Int'l, Inc. v. Srio. de Justicia*, 122 D.P.R. 703 (1988).

su inconstitucionalidad tiene el peso de probarla. *Zachry International v. Tribunal Superior*, supra, pág. 277. Este escrutinio mantendrá la validez de la clasificación a menos que ésta sea claramente arbitraria y no pueda establecerse nexo racional alguno entre la misma y un interés legítimo del Estado. *Vélez v. Srio. de Justicia*, supra, pág. 538.

Teniendo en mente todo lo anteriormente expresado, analicemos el Art. 95 del Código Penal, 33 L.P.R.A. sec. 4032 (Sup. 1987), y en particular el inciso (d) del mismo.

El Art. 95(d) del Código Penal, *supra*, dispone que la agresión se considerará agravada cuando se cometiere por un varón adulto en la persona de una mujer o niño. No hay lugar a dudas de que el inciso (d) del Art. 95, *supra*, establece una clasificación por sexo al disponer que cuando un varón adulto agrede a una mujer tal agresión será agravada. No obstante, esta clasificación se sostendrá si existe una adecuada justificación para ella y el Estado demuestra que la misma resulta ser el medio menos oneroso para proteger el interés social deseado. Al analizar la validez constitucional de esta disposición, debemos, pues, en primer término precisar cuál ha sido la voluntad del legislador al aprobar el Art. 95 del Código Penal, *supra*, y, en particular, el inciso (d) del mismo.

Para determinar cuál fue la intención de la Legislatura debemos acudir al historial legislativo de la ley en controversia. Si ésta tiene una exposición de motivos, por norma general allí encontraremos expresiones relativas al propósito que inspiró su creación. También debemos consultar otros documentos, tales como los informes de las Comisiones que estudiaron el proyecto de ley y los debates celebrados, si la medida fue discutida en el hemiciclo. "Son también pertinentes y es propio utilizarlos en la búsqueda de la intención legislativa, los anteproyectos y los informes alrededor de los mismos que son preparados fuera de la Asamblea Legislativa, cuando ésta los tiene ante sí y adopta sustancialmente esos anteproyectos." (Citas

omitidas.) R.E. Bernier y J.A. Cuevas Segarrra, *Aprobación e interpretación de las leyes en Puerto Rico*, 2da ed. rev., San Juan, Pubs. J.T.S., 1987, Vol. I, pág. 243.

La "Ley para determinar y castigar ... [el] acometimiento y agresión con circunstancias agravantes", Ley de 10 de marzo de 1904, Leyes de Puerto Rico, pág. 42, es el antecedente del Art. 95(d), *supra*. Mediante esta ley se enmendó el Código Penal, entonces vigente, a los fines de incluir en el mismo el delito de acometimiento y agresión con circunstancias agravantes. Esta ley, aprobada a principios del siglo, no contiene una exposición de motivos. Tampoco existe evidencia de informes o debates referentes a la misma. En ausencia de historial legislativo formal, debemos recurrir a otras fuentes para determinar la intención legislativa.

Una de estas fuentes es la historia. El examen de la situación histórica al momento en que se aprobó la ley se ha reconocido como un medio para descubrir la intención legislativa. *Ripoll Alzuru v. Rosa Pagán*, 121 D.P.R. 1, 12 (1988); *Milán Rodríguez v. Muñoz*, 110 D.P.R. 610, 613 (1981); *Zachry International v. Tribunal Superior*, supra, pág. 280; *Celis Alquiler v. Méndez*, 18 D.P.R. 88, 92 (1912); *United States v. Freight Association*, 166 U.S. 290, 318–319 (1897); Bernier y Cuevas Segarra, *op. cit.*, págs. 369, 383–384 y 385. Esto por razón de que entre los propósitos de la acción legislativa se encuentran el "[t]rata[r] *de corregir un mal, alterar una situación existente*, complementar una reglamentación vigente, fomentar algún bien específico o el bienestar general, reconocer o proteger un derecho, crear una política pública o formular un plan de gobierno". (Énfasis suplido.) Bernier y Cuevas Segarra, *op. cit.*, págs. 245–246. En este sentido, la historia nos ayuda a entender las razones que guiaron o motivaron al legislador al aprobar la ley. Pasemos, pues, a considerar la historia pertinente a la aprobación de la "Ley para determinar y

castigar ... [el] acometimiento y agresión con circunstancias agravantes", Ley de 10 de marzo de 1904, *supra.*

El cambio de soberanía de 1898 nos trajo como secuela forzada un cambio en las leyes que regían nuestra convivencia social. Por disposición de la Carta Orgánica de 1900 (Ley Foraker) se creó una Comisión para "revisar las leyes de Puerto Rico, como también los varios códigos de procedimientos ... [y] para formular y proponer las leyes que fueren necesarias para formar un gobierno sencillo, armónico y económico; establecer justicia y asegurar su pronta y eficaz administración". Ley Foraker, 31 Stat. 77, Documentos Históricos, Sec. 40, L.P.R.A. Tomo 1, ed. 1982, pág. 51. Los miembros de esta Comisión, dos (2) norteamericanos y un (1) puertorriqueño,([2]) se reunieron en Estados Unidos y Puerto Rico, y realizaron audiencias públicas en nuestra isla. En el informe que la Comisión sometió al Congreso expresó con relación a su examen del Código Penal que "[e]l trabajo de la comisión debía abrazar ..., una revisión del Código Penal, con el objeto de adaptar la enumeración de los delitos que contiene, definición y castigo de éstos, al sistema americano". *Informe de la comisión para revisar y compilar las leyes de Puerto Rico*, Washington, Government Printing Office, 1901, Tomo I, págs. 27–29. El Congreso no tomó acción sobre las recomendaciones de la Comisión. E.A. Torres, *The Puerto Rico Penal Code of 1902–1975: A Case Study of American Legal Imperialism*, XLV Rev. Jur. U.P.R. 1, 14–15 (1976).

El 31 de enero de 1901 la Legislatura de Puerto Rico aprobó una ley para crear una Comisión de Códigos. Su tarea era "compilar, revisar y codificar un sistema de leyes para Puerto Rico, que incluirá ... un Código Penal. Por este decreto se ordena [a] dicha Comisión de Códigos que dé cuenta con todos sus trabajos al Gobernador de Puerto

---

([2]) Los miembros de esta Comisión fueron los señores Joseph F. Daly, Leo Stanton Rowe y Juan Hernández López.

Rico, quien someterá los Códigos que ella proponga [a] la próxima Asamblea Legislativa de Puerto Rico". Ley creando una Comisión de Códigos, Ley de 31 de enero de 1901, Leyes de Puerto, págs. 161–162. Esta Comisión[3] recomendó la adopción casi *ad verbatim* del Código Penal de California de 1873. A esta recomendación se opuso el comisionado puertorriqueño. No obstante, el Consejo Ejecutivo y la Cámara de Delegados, órganos legislativos de aquel momento, aprobaron la adopción del susodicho Código Penal para Puerto Rico. C. Delgado Cintrón, *Derecho y colonialismo: la trayectoria histórica del derecho puertorriqueño*, Río Piedras, Ed. Edil, 1988, pág. 96. Véanse: M. Rodríguez Ramos, *Breve historia de los códigos puertorriqueños*, XIX Rev. Jur. U.P.R. 233, 262–272 (1950); L. Muñoz Morales, *Compendio de legislación puertorriqueña y sus precedentes*, Río Piedras, Junta Editora de la U.P.R., 1948, págs. 25–26 y 120–122.

De esta manera se adoptó un Código Penal para Puerto Rico en 1902. Éste no contenía, en el capítulo referente a la agresión, una disposición relativa a una modalidad agravada del delito para cuando un hombre agrediera a una mujer.[4]

---

[3] En esta ocasión, el Sr. John M. Keedy sustituyó al Sr. Joseph E. Daly. Éste estuvo encargado de la revisión del Código Penal.

[4] "Art. 232.—Se entenderá por acometimiento (assault) la tentativa ilegal de inferir algún daño violento en la persona de un semejante, acompañada de la aptitud para realizarla al tiempo de intentarse.

"Art. 233.—Todo acometimiento se castigará con multa máxima de quinientos dollars, [o] cárcel por un término máximo de tres meses.

"Art. 234.—Por agresión (battery) se entenderá el empleo voluntario é ilegal de fuerza o violencia contra la persona de un semejante.

"Art. 235.—Toda agresión se castigará con multa máxima de mil dollars, ó cárcel por un término máximo de seis meses, ó ambas penas, á discreción del tribunal.

"Art. 236.—Toda persona que voluntaria y maliciosamente pusiere ó arrojare, ó hiciere poner ó arrojar, vitriolo, ácido corrosivo, ó cualquiera clase de sustancia cáustica, sobre la persona de un semejante, con intención de lastimar las carnes o desfigurar el cuerpo de dicha persona, incurrirá en pena de presidio por un término mínimo de un año y máximo de catorce años.

"Art. 237.—Toda persona culpable de acometimiento contra la persona de un semejante, con arma ó instrumento mortífero, ó empleando medios violentos capaces de producir grave daño personal, incurrirá en pena de presidio por un término máximo de diez años, ó cárcel por un término máximo de dos años ó multa máxima

Este Código ha sido duramente criticado, principalmente por no responder a la realidad puertorriqueña. M. Rodríguez Ramos, *Nuestro Código Penal vigente y el anteproyecto de reforma de 1926*, I Rev. Jur. U.P.R. 49, 50–51 (1932); M. López Rey y Arrojo, *Estudio penal y criminológico del proyecto oficial del Código Penal de 1967 para Puerto Rico*, 2da ed., San Juan, Comisión de Derechos Civiles, 1969, págs. 7–8; Torres, *supra*, págs. 45–47. En este sentido se expresa el ex Juez Presidente Señor José Trías Monge en su obra *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. Universitaria, 1980, Vol. I, págs. 286–287:

> La legislación producida durante los benios republicanos fue fiel reflejo de los tiempos. *La particular consecuencia para el desarrollo del derecho puertorriqueño fue la importación en masa de códigos norteamericanos de escasa relación con el medio local.* (Énfasis suplido.)

El 10 de marzo de 1904 se aprobó una ley que enmendó el Código Penal de 1902. La ley creaba, entre otras cosas, diez (10) agravantes del delito de acometimiento y agresión.[5] A través de ella se incorpora en nuestro Código

---

de cinco mil dollars, ó ambas penas." *Estatutos revisados y códigos de Puerto Rico*, Código Penal de Puerto Rico, Arts. 232–237, 1902, págs. 578–579.

[5] Esta ley dispone, en su parte pertinente:

"Sección 6.—Todo acometimiento y agresión será considerado con circunstancias agravantes en los siguientes casos: 1. Cuando se cometa en la persona de un funcionario legal en el cumplimiento de sus deberes, en caso de saberse ó haberse hecho saber [a] la persona que cometiere el hecho, que la persona agredida era un funcionario en el desempeño de un deber oficial. 2. Cuando se cometiere en un tribunal de Justicia ó en cualquier sitio religioso ó en algún lugar donde se hallaren reunidas varias personas con fines lícitos. 3. Cuando la persona que cometiere el hecho, entre en la morada de una familia particular y cometiere allí la falta de acometimiento y agresión. 4. Cuando se cometiere por una persona robusta y de fuerzas corporales en la de un anciano ó decrépito. 5. *Cuando se cometiere por un varón adulto en la persona de una mujer* ó niño, ó por una mujer adulta en la de un niño. 6. Cuando el instrumento ó los medios que se emplearen fueren tales, que infirieren deshonra [a] la persona agredida, como acometimiento y agresión con foete, azote o bastón. 7. Cuando se infiere una herida grave [a] la persona agredida. 8. Cuando se cometiere con·armas mortíferas en circunstancias que no revistiesen la intención de matar o mutilar. 9. Cuando se cometiere con intención premeditada para el fin calculado de inferir graves heridas corporales. 10. Cuando se cometiere por cualquier persona o personas disfrazadas.

"Sección 7.—Las circunstancias agravantes mencionadas en la sección precedente son de diferentes grados y el Tribunal tomará en consideración dichas circuns-

Penal una modalidad agravada para cuando un hombre comete este delito contra una mujer. Este articulado proviene del Código Penal de Texas vigente en aquel momento. *Lange v. El Pueblo*, 24 D.P.R. 854, 855 (1917). No contamos con debates ni informes legislativos referentes a esta ley. No obstante, esto no es óbice para que indaguemos cuál fue la intención del legislador al incorporar en nuestro Código Penal, como un delito específico, la agresión que inflige un hombre contra una mujer. Como mencionáramos anteriormente, recurriremos al examen de los hechos históricos relacionados con la aprobación de la ley en busca de datos que nos permitan determinar cuál fue la intención legislativa.

La sociedad puertorriqueña de finales del siglo diecinueve y principios del veinte fue una que se caracterizó por la presencia de gran violencia en las relaciones interpersonales. Technical Services of Puerto Rico, Inc., *Etiología de la violencia en Puerto Rico*, Río Piedras [s. ed.], 1977, Vol. III, pág. 62. El historiador puertorriqueño Fernando Picó ha documentado la existencia de agresiones de hombres contra mujeres, desde mediados del siglo diecinueve.([6])

Otra fidedigna fuente de información sobre las agresio-

---

tancias al dictar sentencia ó imponer la pena correspondiente.

"SECCIÓN 8.—La pena correspondiente al delito de acometimiento de carácter grave ó al de acometimiento y agresión de la misma naturaleza, consistirá en multa que no bajará de $50.00 ni excederá de $1,000.00 ó de prisión en cárcel que no bajará de un mes ni excederá de dos años, ó ambas penas, multa y prisión." (Énfasis suplido.) Ley de 10 de marzo de 1904, Leyes de Puerto Rico, págs. 42–43.

([6]) Véase, por ejemplo, lo siguiente:

"El 2 de junio de 1852 el comisario remite al alcalde a la esposa de Luis de la Rosa

'porque la cela con un criado de esta casa, y a cada momento emprenden una cuestión; ya estoi cansado de amenasarlos con esa cárcel, y me dise el referido Luis de la Rosa, que es impocible que se degen de riñas, hasta que pare en una desgracia; por consiguiente lo pongo en conocimiento de V. para ver modo de rremediarlo antes.' [(Cita omitida.)]

"El 23 de febrero siguiente Bigio pide al alcalde que le de (sic) una reprensión a Teodoro Villegas 'por haber aporreado a su Mujer, y siendo ella mejor que el en cuanto a su conducta.' " F. Picó, *Vivir en Caimito*, 2da ed., Río Piedras, Ed. Huracán, 1989, pág. 122.

nes contra mujeres resulta ser la literatura de aquel momento. Technical Services òf Puerto Rico, Inc., *supra*, págs. 62–64. Particularmente la novela naturalista de esa época. Podemos, pues, utilizar estas novelas porque en ellas el escritor se dedica a retratar su realidad circundante. El autor es un observador o expectador de la realidad social. Algunos estudiosos y críticos de la literatura describen el naturalismo como un realismo descarnado. El escritor naturalista describe los acontecimientos de una manera cruda, sin suavizarlos. En sus descripciones éste se apega a la realidad, aün cuando ésta resulte, según algunos, nauseabunda. Véase, sobre el naturalismo en general, J.M. Guzmán, *Apuntes sobre la novelística puertorriqueña*, Madrid, Ed. Hauser y Menet, 1960, pág. 23.

La novela naturalista es el producto de un detenido proceso de observación y estudio de la sociedad por parte del autor.[7] La novela *La Charca* de Manuel Zeno Gandía, publicada en 1894, pertenece al movimiento naturalista. Tanto intelectuales de aquel tiempo como contemporáneos consideran a *La Charca* como un retrato de los problemas sociales de esa época. Véanse: Carta de Eugenio María de

---

"Los expedientes judiciales son remisos en detallar violaciones de las mujeres. Es posible que pocas víctimas de tales atropellos hayan querido prestar testimonio y someterse a interrogatorios sobre el particular. No obstante, la tradición oral conservó la memoria de múltiples atropellos a mujeres." F. Picó, *1898: La Guerra después de la Guerra*, Río Piedras, Ed. Huracán, 1987, pág. 99.

[7] "*La novela naturalista es una novela de observación y análisis*. El novelista todavía inventa, traza un plan, para con él reproducir un trozo de vida cotidiana. Pero esto es sólo el principio. Los hechos aparecen como el desarrollo lógico de los personajes. La cuestión —dice Zola— consiste en poner en pie a criaturas vivas que interpreten la comedia humana con la mayor naturalidad posible delante de los lectores. *El novelista, en tanto, se empeña en esconder lo imaginario tras ese aspecto de realismo* ....

"*En este tipo de trabajo la imaginación no cuenta para nada*. Lo que tiene validez es el trabajo de recolección y ordenación de los materiales documentales .... Lo primero que debe hacer es informarse bien, recoger notas, de todo cuanto pueda saberse del ambiente que desea tratar. Tanto mejor si puede tener contacto personal con ese ambiente .... Conocer los lugares de desarrollo de su novela es su responsabilidad. *Al final, hará mover unos personajes 'reales' en un medio 'real' con lo cual se procura dar al lector 'un fragmento de vida humana.'* " (Énfasis suplido.) E. Álvarez, *Manuel Zeno Gandía: estética y sociedad*, Río Piedras, Ed. U.P.R., 1987, págs. 26–27.

Hostos a Julio Henna y Manuel Zeno Gandía (25 de junio de 1899), publicada en E.M. de Hostos, *Obras Completas*, 2da ed., San Juan, Ed. Instituto de Cultura Puertorriqueña, 1969, T. IV, pág. 215; R. Cartagena, *Puerto Rico Enfermo*, Río Piedras, Ed. Cultural, 1983, pág. 40. Entre estos problemas Zeno enfatiza el de la violencia contra la mujer a manos del hombre. El personaje principal de la novela, Silvina, es una mujer campesina víctima de la agresión física por parte de los hombres con los que se relaciona.[8]

Las fuentes históricas y literarias que hemos examinado nos presentan una innegable realidad. La mujer era considerada por el hombre como propiedad u objeto. Tal percepción propició la violencia contra ésta y generó un grave problema social. Esta era la situación prevaleciente al momento del cambio de soberanía.[9] El Código Penal de 1902 no recoge esta realidad porque, como ya mencionamos, éste estaba totalmente deslindado de ella.

El problema de agresión contra la mujer persistía a principios del presente siglo. Esto se puede captar al estu-

---

[8] Estos pasajes de la obra evidencian lo señalado:

"Gaspar, de cincuenta años, facciones repulsivas, mala catadura, pelo enmarañado y aliento aguardentoso, no era un marido manso. La niña cayó en manos de un marido avieso, del marido grosero, del compañero bestial, *siempre con mano dispuesta a descargar el bofetón*, siempre con los labios abiertos para arrojar la blasfemia. Cuando Silvina consideró su desgracia, pensó en manejar el timón de la nueva vida. Vano empeño, porque la voluntad de Gaspar la hizo más esclava, y el despotismo de su temperamento la dominó por completo.

. . . . . . . . . .

"Silvina en su nueva vida, no aspiraba a mucho: que la mantuvieran, que la consideraran, *que no la hicieran sufrir con malos tratamientos* ....

"Pero Marcante, que no era cuerda de arpa, no vibraba acorde. Quiso una mujer y la encontró. Necio, vanidoso y pedante, no se había preguntado nunca lo que era una mujer ....

"De ese modo, a la primera desavenencia que interpuso entre ellos la dignidad o la miseria, *la mano del déspota se alzó villana y sobre el semblante de la víctima cayó la bofetada del más fuerte*." (Énfasis suplido.) M. Zeno Gandía, *La Charca*, México, Ed. Orión, 1958, págs. 42–43 y 262–263.

[9] Persistía a principios de siglo, y aún persiste en gran medida, una visión del mundo que promueve una percepción de éste que confunde al hombre con todas las personas: el concepto hombre-razón. Segundo Informe de Progreso sobre la Implantación en Puerto Rico de la Ley para la Prevención e Intervención con la Violencia Doméstica de marzo de 1993.

diar los medios noticiosos de esa época. Precisamente en los meses anteriores al de la enmienda al delito de acometimiento y agresión, el periódico *La Democracia* informó sobre una serie de incidentes de agresiones de hombres contra mujeres. *La Democracia*, 7 de enero de 1904, pág. 4; *La Democracia*, 19 de febrero de 1904, pág. 4; *La Democracia*, 29 de febrero de 1904, pág. 4.

Todas las fuentes que hemos examinado demuestran que al momento de aprobarse la enmienda al Código Penal los actos de violencia perpetrados por hombres contra mujeres constituían un grave problema social. A fin de atacarlo directamente y destacar así, como política pública, el repudio oficial del Estado a la violencia del hombre contra la mujer, la Legislatura enmendó el Código para sancionar con mayor rigor esta conducta criminal. Reconoció de esta forma que la violencia del hombre contra la mujer va dirigida a atacar no sólo la integridad personal de la mujer, sino también un ideal social general, el de la igualdad.

Esta modalidad del delito de agresión agravada se mantuvo en los proyectos de reforma del Código Penal de los años 1967, 1969 y 1972. En el *Mensaje del Gobernador a la Asamblea Legislativa Presentando el Anteproyecto del Código Penal*, en 1967, éste enfatizó la necesidad de un nuevo Código que se adaptara a nuestra realidad social. No obstante, añadió, "este nuevo cuerpo legal debe también mantener en el presente y proyectar hacia el futuro aquellas instituciones que, aunque vigentes por largos períodos de tiempo, han logrado evolucionar y por su previsión y flexibilidad responden a las realidades actuales". *Proyecto de Código Penal para Puerto Rico y mensajes, informes, tablas e índice*, Orford, Equity Publishing Corp., 1967, págs. vii-viii. De igual manera el autor del anteproyecto, Francisco Pagán Rodríguez, se expresó en su informe explicativo. "El presente es un proyecto de nuevo Código Penal y no una ley de reformas. Del Código vigente se han conservado solamente aquellas disposiciones que por su previsión y fle-

xibilidad se adaptan a las necesidades de nuestra vida actual." Íd., pág. lxiii. Así encontramos que el Informe de la Comisión de lo Jurídico Penal del Senado sobre el P. del S. 581 de 9 de marzo de 1967, 5ta Asamblea Legislativa, 3ra Sesión Ordinaria, en su Art. 123(d) sancionaba la agresión agravada "[c]uando se cometiere por un varón adulto en la persona de una mujer ...". Íd., pág. 39. El Informe de la Comisión de lo Jurídico Penal del Senado sobre el P. del S. 19 de 14 de enero de 1969, 6ta Asamblea Legislativa, 1ra Sesión Ordinaria, págs. 39–40, también mantuvo esta modalidad del delito de agresión agravada. Finalmente, el *Anteproyecto de Código Penal para Puerto Rico*, preparado por la Oficina de Justicia Criminal del Departamento de Justicia, también conservó el delito. F. Alfaro de Quevedo, *Anteproyecto de un Código Penal para Puerto Rico*, San Juan, Departamento de Justicia, 1972, págs. 9 y 71–72. Únicamente José Miró Cardona, en su *Borrador para un Código Penal para Puerto Rico*, abogó por la completa eliminación del delito de agresión y su sustitución por el de lesiones J. Miró Cardona, *Borrador y notas explicativas al proyecto de Código Penal redactado por Francisco Pagán Rodríguez*, Río Piedras [s. ed.], 1970, T. 1, págs. 48–49 y T. 2, págs. 43–49.

Estos intentos de reforma no alcanzaron su cometido. Es en 1974 que se logra adoptar un nuevo Código Penal para Puerto Rico. En los informes de las comisiones legislativas sobre el P. del S. 753, éstas manifestaron su intención de lograr que el nuevo Código atendiera los problemas específicos de la sociedad y respondiera a las necesidades de ella. Informe de la Comisión de lo Jurídico Penal del Senado sobre el P. del S. 753 de 19 de marzo de 1974, 7ma Asamblea Legislativa, 2da Sesión Ordinaria, pág. 2. En este sentido se expresó que:

> [e]l *Código Penal es una respuesta a la historia, a la cultura y a la dinámica social de una comunidad*. En el quehacer de las vistas y en la Comisión debatimos sobre los carácteres y contor-

nos de nuestra sociedad y qué bienes desea proteger y cómo es que puede atesorarlos. (Énfasis suplido.) Informe de la Comisión de lo Jurídico Penal de la Cámara de Representantes sobre el P. del S. 753 de 17 de junio de 1974, 7ma Asamblea Legislativa, 2da Sesión Ordinaria, pág. VIII.

Estas manifestaciones son evidencia fehaciente de que la Legislatura estudió el proyecto del nuevo Código Penal a la luz de la realidad social existente en 1974. Ello debido a que su propósito era aprobar un Código que pudiera ser instrumento útil en la lucha contra la criminalidad.

Como parte del proceso de estudio del P. del S. 753 se analizó el Código Penal de 1902, entonces vigente. Informe de la Comisión de lo Jurídico Penal de la Cámara de Representantes sobre el P. del S. 753, *supra*, págs. XX–XXIII. Sobre éste se concluyó que el mismo "ha quedado rezagado en el tiempo y ha perdido su adecuación y adaptabilidad tanto conceptual como dinámica a los tiempos que vivimos ...". Íd., pág. XXIII. Sin embargo, es importante notar que la Comisión de lo Jurídico Penal de la Cámara de Representantes expuso en su informe que se conservarían aquellos delitos del Código de 1902 que estaban acordes con la realidad.

> En la Parte Especial se han conservado aquellas instituciones del Código vigente que se adaptan bien a nuestra vida actual, se han mejorado aquellas que resultan inadecuadas y se han incluído (sic.) nuevos delitos y penalidades a tono con nuestro mundo moderno. (Énfasis suplido.) Íd., pág. XLI.

Entre los delitos que se conservaron se encuentra el de agresión agravada en la modalidad que estamos examinando. P. del S. 753 de 1974, págs. 37–38. Estas declaraciones de las comisiones legislativas son prueba de que se hizo un análisis de los delitos del Código de 1902 a fin de determinar si éstos estaban o no acordes con el propósito de la legislación. A saber, la adopción de un nuevo Código Penal ajustado a la realidad social prevaleciente. El hecho de que se mantuviera en el delito de agresión agravada la modalidad relativa al hombre que agrede a una

mujer, es evidencia de que ésta satisfizo el propósito legislativo de crear un Código Penal que atendiera a los problemas específicos de la sociedad.

Otra prueba de esto la encontramos en el hecho de que en el P. del S. 753, *supra*, se eliminaron dos (2) modalidades del delito que aparecían en el anterior Código: la referente al uso de instrumentos o medios que infirieren deshonra a la persona agredida y la relativa a la agresión cometida por personas disfrazadas. Véase P. del S. 753, esc. 5. El Departamento de Justicia, en su análisis del nuevo Código, expresó que la eliminación de estos incisos se debió a "que esos actos respondían a momentos históricos en que se utilizaban dichos medios para agredir". Oficina de Justicia Criminal, *Código Penal de Puerto Rico comentado: Ley Núm. 115 de 22 de julio de 1974*, San Juan, Departamento de Justicia, 1974, pág. 123. Por lo tanto, la permanencia del inciso relativo a la agresión cometida por un hombre contra una mujer implica que éste, contrario a los eliminados, mantenía su vigencia.[10]

Hemos expuesto el desarrollo de nuestro Código Penal a partir del cambio de soberanía para demostrar que la introducción en nuestro Derecho del delito de agresión agravada, en su modalidad relativa al hombre que agrede a la mujer, responde al deseo de confrontar y combatir un grave problema social real. Un problema endémico que justificó la permanencia del delito en el Código de 1974.

Además, no podemos cerrar los ojos ante el hecho de que en la actualidad existe una tendencia hacia el aumento en el número de agresiones contra mujeres. Tal realidad fue precisamente la que motivó al legislador a reconocer la necesidad de atender con aún mayor especificidad la modalidad de la agresión contra la mujer conocida como "violencia doméstica". Ley de Violencia Doméstica, Ley Núm. 54

---

[10] En 1983 se enmendó el Art. 95 (33 L.P.R.A. sec. 4032 (Sup. 1987)), a los fines de convertir en delito grave dos modalidades del mismo. Esta ley no afectó el inciso que estamos examinando.

de 15 de agosto de 1989 (8 L.P.R.A. sec. 601 *et seq.*). Esta modalidad, por sus características muy particulares, exigía un tratamiento especial. La Ley Núm. 54, *supra*, estableció un esquema, civil y criminal, para atender estas circunstancias. Ahora bien, el Art. 1.2 de la Ley Núm. 54, *supra*, 8 L.P.R.A. sec. 601, que recoge la política pública del Estado en este sentido, claramente revela que a pesar de la legislación ir dirigida a penalizar la conducta tanto de hombres como de mujeres, su preocupación primordial fue por las agresiones contra las mujeres y los menores, quienes resultan ser mayormente las víctimas:[11]

> El Gobierno de Puerto Rico reconoce que la violencia doméstica es uno de los problemas más graves y complejos que confronta nuestra sociedad. En el desarrollo de la política sobre este asunto, debemos dar énfasis a atender las dificultades que las situaciones de violencia doméstica presentan, *particularmente a mujeres y menores para preservar su integridad física y emocional*, procurar su seguridad y salvar sus vidas.
>
> La violencia doméstica es una de las manifestaciones más críticas de los efectos de la inequidad en las relaciones entre hombres y mujeres. Las ideas, actitudes y conductas discriminatorias también permean las instituciones llamadas a resolver y a prevenir el problema de la violencia doméstica y sus consecuencias. Los esfuerzos de estas instituciones hacia la identificación, comprensión y atención del mismo han sido limitados y en ocasiones inadecuados. (Énfasis suplido.) Art. 1.2 de la Ley Núm. 54, *supra*.

Ahora bien, llegar a la conclusión de que una vez aprobada la legislación especial contra la violencia doméstica

---

[11] Recordemos que el Art. 95(d), 33 L.P.R.A. sec. 4032(d) (Sup. 1987), no permite tener una idea exacta de cuántas esposas o compañeras son víctimas de maltrato por parte de sus cónyuges o compañeros. Sobre este particular nos comenta Teresita Grovas, en *Maltrato físico a la mujer en Puerto Rico*, 7 (Núms. 1 y 2) Homines U.I.A., 243 (1983), que

"...el hecho de que no exista un delito tipificado como agresión de la esposa por parte del marido no permite a la Policía tener estadísticas sobre la cantidad de delitos de este tipo que se cometen durante un período de tiempo, toda vez que aparecen bajo agresión agravada, pero no hay modo de saber quién ha podido ser la persona perjudicada o agredida. Bajo esta clasificación general de agresión agravada pueden aparecer todo tipo de agresiones, desde una pelea en una barra, en la calle, o un problema de violencia doméstica."

ya resultaba innecesario el Art. 95(d), *supra*, es darle la espalda a una triste realidad que permea no sólo en nuestra sociedad, sino también en la mayor parte de las sociedades del mundo actual.[12] Resulta significativo el hecho de que a pesar de que se aprueba la Ley Núm. 54, *supra*, se mantuvo vigente la protección del Art. 95(d), *supra*; un claro reconocimiento de que el problema de la violencia contra la mujer no se limita a una relación de pareja, sino que también persiste el grave problema de la mujer que es víctima de agresión por parte de desconocidos. En otras palabras, el legislador aunque particularizó una modalidad para atenderla con mayor especificidad, ha reconocido que aún existe un problema de violencia generalizada contra la mujer. La Legislatura escogió como instrumento de lucha contra este problema de violencia generalizada la legislación penal, el Art. 95(d), *supra*.

Una de las finalidades principales de la creación de delitos es lograr, a través de los mismos, un efecto disuasivo en la sociedad y la modificación de patrones de conducta nocivos. El declarar como delictiva un tipo de conducta va encaminado a crear conciencia del problema, paso indispensable éste para desarraigar una serie de valores, mitos y patrones culturales que perpetúan la conducta que se quiere modificar. En este sentido, con relación al Código Penal de 1974, se expresó que

"[t]oda sanción penal necesariamente depende del comportamiento pasado de los seres humanos. En base a (sic.) ese comportamiento pasado es que se estructura la ley penal, *con el objetivo de controlar la conducta humana futura. La conducta humana pasada que debemos tomar en consideración es la que realmente representó un peligro para la sociedad y cuya recurrencia debe evitarse. En este sentido, hay que tener presente que la conducta humana está altamente influenciada por el temor al castigo y aquí reside el efecto disuasivo del Código. (Én-*

---

[12] De acuerdo con la Cirujano General de Estados Unidos, la violencia contra la mujer en Estados Unidos sobrepasa cualquier otra causal por daño recibido por una mujer adulta. Cada quince (15) minutos una mujer es golpeada.

fasis suplido.) Informe de la Comisión de lo Jurídico Penal de la Cámara de Representantes sobre el P. del S. 753, *supra*, pág. XIX. Véase, además, Informe de la Comisión de lo Jurídico Penal del Senado sobre el P. del S. 753, *supra*, pág. 13.

El establecer como firme política pública del Estado el que no se tolerará la agresión contra la mujer, ya sea por conocidos o por desconocidos, tiene el importante efecto de socavar el nocivo proceso de racionalización que a menudo, tanto el ofensor como la sociedad, llevan a cabo para justificar la agresión y que contribuye a perpetuar este mal social. Esta racionalización conduce a excusar ese comportamiento criminal: (1) devaluando a la víctima por considerar que ésta no posee valor alguno en sí misma o por haber actuado en forma que hace que la agresión sea merecida; (2) "negando a la víctima convencido de que ésta no sufrirá o que es la agresión lo que ésta realmente desea; (3) redefiniendo su conducta no como acto criminal, sino como justiciero o retributivo y (4) considerando injusta la ley que prohíbe o exige la conducta, por lo que se justifica su actuación". O.E. Resumil de Sanfilippo, *Derecho Procesal Penal*, Orford, Equity Publishing Co., 1990, T. 1, pág. 210.

Los tratadistas Sir Leon Radzinowicz y Joan King sostienen que hay dos (2) tipos de disuasión intrínsecos a la ley penal. La "disuasión individual" es aquella que va dirigida a prevenir al ofensor para que no repita su conducta criminal. Mientras que la dirigida a prevenir a toda la comunidad para que no realice ese tipo de conducta se conoce como la "disuasión general". L. Radzinowicz y J. King, *The Growth of Crime: The International Experience*, Nueva York, Ed. Basic Books, 1977, pág. 126. La profesora Resumil de Sanfilippo también sostiene que "[l]a disuasión apoyada en la fuerza que la amenaza de la pena puede tener sobre el individuo para quitarle la voluntad de infringir las normas penales" es una finalidad de la sanción penal. O.E. Resumil de Sanfilippo, *Criminología General*, 2da ed., Río Piedras, Ed. U.P.R., 1992, pág. 161.

Al aprobar el Art. 95(d), *supra*, la Legislatura puntua-

lizó el que la violencia contra la mujer constituye una grave injusticia pública y no simplemente una desventaja personal. Manifestó de esta forma su intención de lidiar con el persistente problema social de agresión del hombre contra la mujer. El crear un delito específico que identifica como conducta criminal agravada la agresión de un hombre contra una mujer refleja que la intención legislativa va más allá de simplemente establecer un mecanismo general de protección a la mujer. Su propósito primordial obviamente va dirigido a disuadir a los hombres de la comunidad que estuviesen inclinados a incurrir en estos actos de violencia, y a tratar de cambiar sus patrones de conducta. Su finalidad es lograr que la mujer se pueda sentir segura, tanto en la calle como en el hogar, y hacer que el sistema de justicia criminal responda más adecuadamente a las necesidades de las mujeres en nuestra sociedad. Este es el interés que el Estado pretende adelantar mediante el Art. 95(d) del Código Penal, *supra*.

Una vez determinado cuál es el interés estatal que se procura adelantar con la disposición de ley en controversia, lo que procede es que se examine si éste es un interés apremiante del Estado. 3 *Treatise on Constitutional Law: Substance and Procedure* Sec. 18.3, pág. 15 (1992). El Estado tiene el deber de velar por el bienestar general de la comunidad. En el ejercicio de este deber, atiende con preferencia aquellos problemas sociales que atentan contra ese bienestar. Según ya hemos expuesto, las agresiones perpetradas por hombres en contra de mujeres constituyen, desde hace muchos años, un alarmante problema social en Puerto Rico. Particularmente debido a que inciden sobre la integridad personal de un amplio sector de la población y socavan el ideal de igualdad. Esta conducta menoscaba grandemente el bienestar general. Por lo tanto, el interés del Estado en disuadir a sus miembros para que desistan de ella, y en modificar patrones de conducta noci-

vos que tan arraigados están en nuestro pueblo, es un interés de naturaleza apremiante.

Finalmente, debemos considerar si la clasificación en controversia, es decir el Art. 95(d), *supra,* resulta ser el medio menos oneroso para alcanzar el interés apremiante del Estado. Recordemos que el interés del Estado es disuadir y modificar la conducta agresiva de los hombres contra las mujeres.

El Art. 95(d), *supra,* es el medio menos oneroso para adelantar este interés estatal. Al puntualizar y sancionar específicamente las agresiones cometidas por hombres contra mujeres, el Estado está tratando de alcanzar el objetivo de la disuasión y modificación de la conducta de un sector numeroso de la población masculina. El delito de agresión simple y las modalidades agravadas (e) y (g), aunque sancionan la conducta, no enfocan específicamente ni destacan el grave problema social que se quiere atacar y, por ende carecen, del efecto disuasivo y modificador que el Estado desea alcanzar como parte de su lucha para erradicar la lacra social que constituye la violencia del hombre contra la mujer.

El inciso (d) del Art. 95, *supra,* es el único que satisface este interés apremiante del Estado. Al particularizar, no sólo la conducta sancionada sino también a la víctima y al victimario, logra generar conciencia sobre la gravedad del problema y puntualiza el repudio oficial de la comunidad hacia la conducta que allí se criminaliza, propiciando así el efecto disuasivo y modificador deseado. Por lo tanto, el Art. 95(d) del Código Penal, *supra,* satisface el examen de escrutinio estricto y no hay vicio de inconstitucionalidad en él.